IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF Hawai'i

```
_____  )
                                  )
WARNE KEAHI YOUNG,                )
                                  )
                    Plaintiff,    )
                                  )
          v.                      )  Civ. No. 11-00580 ACK-RLP
                                  )
COUNTY OF HAWAII, a municipal     )
corporation; HAWAII ISLAND        )
HUMANE SOCIETY S.P.C.A., a non-   )
profit corporation; DONNA         )
WHITAKER, individually and in     )
her official capacity as          )
Executive Director of the Hawaii  )
Island Humane Society S.P.C.A.;   )
STARR K. YAMADA, individually     )
and in her official capacity as   )
a Humane Officer; MICHAEL G.M.    )
OSTENDORP; CARROLL COX; DARLEEN   )
R.S. DELA CRUZ; ROBERTA KAWENA    )
YOUNG; DOE DEFENDANTS 1-50,       )
                                  )
                    Defendants.   )
_____  )
                                  )
ROBERTA KAWENA YOUNG,             )
                                  )
          Cross Claimant,         )
                                  )
          v.                      )
                                  )
MICHAEL G.M. OSTENDORP, CARROLL   )
COX, and DARLEEN R.S. DELA CRUZ,  )
                                  )
          Cross Defendants.       )
_____  )
```

ORDER (1) GRANTING IN PART AND DECLINING IN PART DEFENDANTS
COUNTY OF HAWAI'I, HAWAII ISLAND HUMANE SOCIETY S.P.C.A., DONNA
WHITAKER, STARR K. YAMADA, AND MICHAEL OSTENDORP'S MOTIONS FOR
SUMMARY JUDGMENT AS TO PLAINTIFF'S SECOND AMENDED COMPLAINT (2)

**DECLINING DEFENDANTS ROBERTA KAWENA YOUNG, CARROLL COX, AND DARLEEN DELA CRUZ'S MOTIONS FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S SECOND AMENDED COMPLAINT, AND (3) DECLINING CROSSCLAIM DEFENDANTS MICHAEL OSTENDORP, CARROLL COX, AND DARLEEN DELA CRUZ'S MOTIONS FOR SUMMARY JUDGMENT AS TO ROBERTA KAWENA YOUNG'S CROSSCLAIM**

**PROCEDURAL BACKGROUND**

On September 23, 2011, Plaintiff Warne Keahi Young ("Plaintiff") filed a Complaint against Defendants County of Hawaiʻi, the Hawaii Island Humane Society S.P.C.A. ("HIHS" or "Humane Society"), Donna Whitaker (individually and in her official capacity as Executive Director of HIHS), Starr K. Yamada (individually and in her official capacity as a HIHS Officer), Michael Ostendorp, Carroll Cox, Darleen Dela Cruz, and Roberta Kawena Young.  (ECF No. 1).  On January 9, 2012, Plaintiff filed a First Amended Complaint against all Defendants.  (ECF No. 8). On March 30, 2012, Plaintiff filed a Second Amended Complaint ("SAC").[1/]  (ECF No. 44).

On September 24, 2012, Roberta Kawena Young ("Roberta Young") filed a Crossclaim against Defendants Ostendorp, Cox, and Dela Cruz.  (ECF No. 76-1).

On December 28, 2012, Defendant Roberta Young filed a "Motion for Summary Judgment" as to Plaintiff's Second Amended

_____

[1/] Plaintiff filed a "Motion for Leave to File Second Amended Complaint" on January 30, 2012 (ECF No. 17), which was subsequently granted by Magistrate Judge Puglisi's order on March 19, 2012. (ECF No. 39).

-2-

Complaint.  (ECF No. 102).  On January 8, 2013, Defendant Roberta

Young filed a Concise Statement of Facts in Support of her Motion

for Summary Judgment.  (ECF No. 108).  Plaintiff filed a

Memorandum in Opposition and a Concise Statement of Facts on

January 10, 2013.  (ECF No. 113, 114).  Defendant Roberta Young

did not file a Reply.  (See generally, ECF Docket).

     On December 31, 2012, Defendants County of Hawaiʻi,

HIHS, Donna Whitaker, and Starr Yamada (collectively, "HIHS

Defendants") filed a "Motion for Summary Judgment Against

Plaintiff Warne Keahi Young" ("HIHS MSJ") and a Concise Statement

of Facts in support of their MSJ ("HIHS Defs.' CSF").  (ECF Nos.

98 & 99).  The HIHS Defendants also filed an additional exhibit

to their MSJ on January 2, 2013.  (ECF No. 101).  Plaintiff filed

his Opposition to the HIHS Defendants' MSJ and a Concise

Statement of Facts ("Plntf.'s HIHS CSF") on January 10, 2013.

(ECF No. 109, 114).  On February 21, 2013, the HIHS Defendants

filed their Reply in support of their MSJ.  (ECF No. 139).  The

HIHS Defendants also filed an errata to their Reply on February

22, 2013.  (ECF No. 140).  On March 5, 2013, Plaintiff filed an

Amended Concise Statement of Facts.[2/]  (ECF No. 145).  This Court

_____

     [2/] The Court notes that Plaintiff's Amended Concise
Statement of Facts was filed only two days before the March 7,
2013 hearing.  (ECF No. 145).  This filing is in clear violation
of Local Rule 7.4, which provides that Plaintiff was required to
file the CSF at least twenty-one days prior to March 7.
Furthermore, this filing is prejudicial because it did not
                                             (continued...)

held a hearing on March 7, 2013 regarding the HIHS Defendants'
MSJ and Defendant Roberta Young's MSJ.  (ECF No. 147).

Also on December 31, 2012, Defendants Ostendorp, Cox,
and Dela Cruz each filed a "Motion for Summary Judgment as to
Plaintiff's Second Amended Complaint Filed on March 30, 2012 and
Crossclaim Plaintiff Roberta Young's Crossclaim Filed on
September 24, 2012" ("Ostendorp's MSJ," "Cox's MSJ," and "Dela
Cruz's MSJ" respectively).  (ECF No. 103, 104, 105).  Ostendorp,
Cox, and Dela Cruz also filed a Joint Separate Concise Statement
of Facts in support of their Motions for Summary Judgment
("Ostendorp, Cox, and Dela Cruz's JCSF").  (ECF No. 106).  On
January 10, 2013, Plaintiff filed a Memorandum in Opposition to
Ostendorp's MSJ, a Memorandum in Opposition to Cox's MSJ, and a
Memorandum in Opposition to Dela Cruz's MSJ.  (ECF No. 110, 111,
112).  Plaintiff also filed a Concise Statement of Facts in
response to Defendants' Joint Statement of Facts ("Plntf.'s
JCSF").  (ECF No. 114).  On January 23, 2013, Plaintiff untimely
filed a "Supplemental Concise Statement of Material Facts in
Opposition to Defendant[s] Ostendorp, Cox, and Dela Cruz['s]
Joint Separate Concise Statement of Facts in Support of Motion

---

[2/] (...continued)
provide sufficient time for Defendants to respond in their reply.
Accordingly, Plaintiff's Amended CSF "may be disregarded by the
court."  See Local Rule 7.4.  Nevertheless, the Court has
considered Plaintiff's Amended Concise Statement of Facts.

for Summary Judgment" ("Plntf.'s Supp. JCSF").[3/]  (ECF No. 121).

On January 28, 2013, Ostendorp, Cox, and Dela Cruz filed a single

Reply Memorandum responding to Plaintiff's Oppositions.  (ECF No.

124).

On January 29, 2013, eight days past the deadline for

opposition memorandums,[4/] Crossclaim Plaintiff Roberta Young

filed an "Omnibus Memorandum in Opposition to Defendants Michael

G.M. Ostendorp, Carroll Cox, and Darleen R.S. Dela Cruz'[s]

Motion for Summary Judgment."  (ECF No. 129).  Crossclaim

Plaintiff Roberta Young did not file a Concise Statement of

Facts.  See ECF Docket.  Defendants Ostendorp, Cox, and Dela Cruz

did not file a reply.  Id.  On February 11, 2013, this Court held

a hearing regarding Defendants Ostendorp, Cox, and Dela Cruz's

Motions for Summary Judgment as to Plaintiff's Second Amended

Complaint and Roberta Young's Crossclaim.  (ECF No. 133).

In the February 11 and March 7, 2013 hearings, the

Court observed that Exhibit 4 of Plaintiff's Supplemental Joint

---

[3/] Local Rule 7.4 states that an opposition for a motion set
for hearing "shall be served and filed not less than twenty-one
(21) days prior to the date of the hearing."  Local R. of
Practice for the U.S. Dist. Court for the Dist. of Haw. 7.4.
Because the hearing date for these summary judgment motions was
set for February 11, 2013, Plaintiff's documents should have been
filed by January 21, 2013.  Nevertheless, the Court has examined
the documents during the course of considering this case.

[4/] The Court notes that, according to Local Rule 7.4 as
explained supra in fn.3, Crossclaim Plaintiff Roberta Young's
Oppositions were due by January 21, 2013.

Concise Statement of Facts (ECF No. 121) is a heavily redacted report of the State of Hawaii Department of the Attorney General's ("AG") investigation regarding an allegedly forged general power of attorney dated September 12, 2009.  On April 3, 2013, this Court issued an Order Granting in Part and Denying in Part Plaintiff's Motion to Compel Discovery Response and directed the Hawai'i AG to submit to this Court an unredacted version of the report.  ECF No. 152. The Court received an unredacted copy of the Hawaii AG's report on April 23, 2013.  (ECF No. 154 & 155).  The Court subsequently allowed the parties to view the unredacted version of the AG report and to submit supplemental briefing regarding the report's effect on Defendants' MSJs.  (ECF No. 155).  Plaintiff timely submitted a Supplemental Memorandum in Opposition discussing the effect of the report on Defendant's MSJs.  (ECF No. 156).[5]

## FACTUAL BACKGROUND

This case arises from the seizure of seventeen dogs ("Dogs") from a residence in Hilo and the subsequent events that resulted in the HIHS's disposal of the Dogs by way of euthanasia or offering the Dogs for adoption.  The parties agree on the following basic outline of events, but they disagree regarding the details.

---

[5]  None of Defendants timely filed any supplemental briefing regarding the Hawai'i AG report.

At some point in 2007, Plaintiff was charged with Animal Cruelty in the 2nd Degree under Haw. Rev. Stat. § 711-1109.[6/]  See HIHS Defs.' MSJ Ex. A at 4, Ex. F. at 92-93, ECF No. 98.  After pleading guilty to the offense of animal neglect and cruelty, Plaintiff subsequently was fined and placed on probation.  HIHS Defs.' MSJ Ex. F at 93-94, 106-107, ECF No. 98.  As a result of the charges in 2007, Plaintiff was only allowed to have ten dogs at his house.  Id at 106-07.

On September 25, 2009, Yamada, an officer of HIHS, applied for a search warrant in the District Court of the Third Circuit of the State of Hawai'i to search Plaintiff's residence at 42 W. Kahaopea Street, District of South Hilo, HI ("Residence").[7/]  See HIHS Defs.' MSJ Ex. A, ECF No. 98; SAC at 7, ECF No. 44.  According to the affidavit that Yamada submitted as part of the application, Yamada had observed two of the Dogs on June 30, August 17, September 18, and September 24, 2009.  Id.

---

[6/] At the time of Plaintiff's charge in 2007, H.R.S. § 711-1109 stated, *inter alia*, that a person commits the offense of cruelty to animals in the second degree if the person intentionally, knowingly, or recklessly tortures an animal, "deprives a pet animal of necessary sustenance," or uses an animal to fight other animals."  Under the statute, cruelty to animals is classified as a misdemeanor.  H.R.S. § 711-1109(4) (1993 & Supp. 2007).  The record is not clear as to why Plaintiff was charged with Animal Cruelty in the 2nd Degree in 2007.

[7/] During the time period when the events giving rise to this claim occurred, Plaintiff actually resided at the Residence, although at times he lived in his truck.  (SAC at 8, HIHS Defs.' MSJ Ex. F at 24, ECF No. 44).

She observed among other things that (1) the kennels of the two Dogs had feces covering the bottoms of the cages, (2) the Dogs did not have water in their bowls, and (3) one of the Dogs appeared to have a skin infection.  Id.  The District Court of the Third Circuit, State of Hawai'i subsequently granted Search Warrant No. 09-001 on September 25, 2009 ("Search Warrant") based on the search warrant application.  Id.

The Search Warrant empowered HIHS officers to search for and seize any abused animals at the Residence, as well as documents establishing the identity of the person who owned or controlled the Residence.  HIHS Defs.' MSJ at 3, Ex. B, ECF No. 98.

On the morning of September 29, 2009,[8/] Yamada executed the search warrant at the Residence and seized the Dogs, pieces of mail belonging to Plaintiff, and a court document in Plaintiff's name.  SAC at 8, ECF No. 44.  On that same morning of September 29, 2009, Plaintiff traveled to Oahu; he was not at the Residence when HIHS executed the search warrant.  Id.  On September 30, 2009, a Return of Search Warrant No. 09-001 was filed in the District Court of the Third Circuit, State of

---

[8/] The SAC states the date of September 29, 2011, but the Court assumes that Plaintiff meant September 29, 2009, which is the year cited for events surrounding the date of the search and seizure.  At Plaintiff's deposition dated November 16, 2012, Plaintiff's attorneys clarified that the correct date is September 29, 2009.  HIHS Defs.' MSJ Ex. F at 58.

Hawaiʻi.  Id.  Yamada attached an inventory statement to the
Return of Search Warrant containing a list of the Dogs, pieces of
mail, and a court document seized from the Residence.  Id at 9.

Shortly thereafter, on or about October 1, 2009,
Plaintiff and Roberta Young[9/] met with Defendant Ostendorp, an
attorney in private practice, in Honolulu at the Waikiki Yacht
Club.  Dec. of Ostendorp at 3, ECF No. 139; Plntf.'s Supp. JCSF
Ex. 4 at 000020, ECF Nos. 154 & 155.  Ostendorp agreed to help
Plaintiff and Roberta Young regarding the seizure of the Dogs on
September 29, 2009.  Id.  As a result of the agreement to help
Plaintiff and Roberta Young, Ostendorp flew with Defendant Cox
and Plaintiff to Hilo.  Id.  Subsequently, Ostendorp met with
HIHS Officer Yamada on October 5, 2009 regarding the status of
the Dogs.  Id.

During Ostendorp's meeting with Officer Yamada on
October 5, 2009, Ostendorp told Yamada that he represented
Plaintiff, that Plaintiff was under suicide watch in a Honolulu
hospital, and informed her that he "wanted to work this out
because [Plaintiff] did not want to get into any more trouble
since he was still on probation."  Plntf.'s Supp. JCSF Ex. 4 at

---

[9/] Roberta Young is Plaintiff's biological mother, but
Plaintiff refers to her as his sister.  HIHS Defs.' MSJ Ex. F at
39-40.  At the hearing on February 11, 2013, Plaintiff's counsel
clarified that Plaintiff at some point in time had been adopted
by his grandmother.

00016, ECF Nos. 154 & 155.[10/]  Yamada indicated that an owner surrender of the dogs would be an ideal way to resolve the situation.  Id.

At some point after the October 5 meeting, Defendant Ostendorp drafted a general Power of Attorney dated September 12, 2009, ("POA") purporting to appoint Roberta Young as Plaintiff's attorney-in-fact.  SAC at 16, Dec. of Ostendorp at 3 ¶ 6-7, ECF No. 139-6.  On October 7, 2009, Ostendorp called Yamada and stated that Roberta Young had a signed power of attorney from Plaintiff, and that Roberta Young wanted to surrender the dogs to HIHS.  Plntf.'s Supp. JCSF Ex. 4 at 00016, ECF Nos. 154 & 155. Yamada told Ostendorp that she would need to speak with Roberta Young.  Id.  A woman identifying herself as Roberta Young called later that day, stated that she had a power of attorney from Plaintiff, and indicated that she wanted to surrender the Dogs to HIHS.  Id.  During the conversation, the woman told Yamada that she was fearful of Plaintiff and did not want him to find out that she had surrendered the Dogs.  Id.  Using Plaintiff's

---

[10/] Plaintiff submitted Exhibit 4, which is a redacted copy of the Hawaiʻi AG report, as part of his exhibits opposing Defendants' MSJs.  The Court cites to the Hawaiʻi AG report in Plaintiff's Supplemental Joint Concise Statement of Facts (ECF No. 121-7) to acknowledge that Plaintiff submitted the document into the record.  An unredacted version of the Hawaiʻi AG report is contained in the record at ECF Nos. 154 & 155.  The Court considers the unredacted version of the AG report in place of the redacted Exhibit 4, and references to Exhibit 4 in this order refer to the unredacted version.

general POA, Roberta Young completed an Animal Surrender Policy Form surrendering "her dogs" to HIHS on October 7, 2009 ("Surrender Form").  SAC at 16; HIHS Defs.' MSJ at Ex. C, D, & E, ECF No. 98.  She gave the Surrender Form to Ostendorp, who in turn transmitted it to HIHS along with a letter asking Yamada not to notify Plaintiff regarding the status of the Dogs because "he is not the owner of the dogs."  Id.

On October 13, 2009, Yamada sent an email requesting a power of attorney from Ostendorp.  Plntf.'s Supp. JCSF Ex. 3, ECF No. 121.  Ostendorp's office sent the September 12, 2009 general POA to Yamada.  Id.  Subsequently, HIHS euthanized nine of the Dogs and placed eight of them for adoption.  HIHS Defs.' MSJ at 6 n.3, ECF No. 98.

## I. Defendants' Version of the Facts

Defendants state that Plaintiff informed attorney Ostendorp that he was afraid of criminal prosecution for the neglect of the Dogs that had been seized at the Residence and for being accused of violating the terms of his probation from the 2007 animal neglect charges.  HIHS Defs.' MSJ Reply, Dec. of Ostendorp at 2, ECF No. 139-6.  When Ostendorp spoke with HIHS regarding Plaintiff's alleged violations of law, HIHS suggested that if the Dogs were surrendered to HIHS, Plaintiff would not be charged with violating state animal cruelty laws and thus his probation would not be revoked.  Plntf.'s Supp. JCSF Ex. 4 at

000016, ECF Nos. 154 & 155.  As a result of the surrender of the Dogs, HIHS never initiated proceedings to file charges against Plaintiff for violating any animal cruelty law in 2009.  See HIHS Defs.' MSJ Ex. F at 104-105, ECF No. 98.  Additionally, Plaintiff at some point threatened to commit suicide because of the prospect of facing jail time as a result of the September 29, 2009 seizure of the neglected Dogs.[11/]  Dec. of Ostendorp at 3, ECF No. 139-6.  Plaintiff and Roberta Young decided to pick the date of September 12, 2009 on the general POA in order to substantiate Plaintiff's claim that Roberta Young was the true owner of the Dogs during the time of the September 29, 2009 seizure.  Id at 3.

## II.  Plaintiff's Version of the Facts

Plaintiff claims that he never told Defendant Ostendorp that he was afraid of criminal prosecution for neglecting the Dogs.  Ostendorp, Cox, and Dela Cruz's JCSF Ex. A at 104, ECF No.

---

[11/] At the time the Dogs were seized on September 29, 2009, H.R.S. § 711-1109 stated, inter alia, that a person commits the offense of animal cruelty in the second degree by "intentionally, knowingly, or recklessly" (1) depriving a pet animal of necessary sustenance or (2) confining a pet animal in a kennel or cage in a cruel or inhumane manner.  H.R.S. § 711-1109 (1993 and Supp. 2009).  Additionally, H.R.S. § 711-1109.6 in 2009 stated, inter alia, that a person commits the offense of animal hoarding by "intentionally, knowingly, or recklessly" (1) possessing more than fifteen dogs (2) failing to provide necessary sustenance for each dog, and (3) failing to correct the conditions under which the dogs are living, where conditions injurious to the dogs' or owner's health and well-being result from the person's failure to provide necessary sustenance.  H.R.S. § 711-1109 (1993 and Supp. 2009)  Animal hoarding is a misdemeanor.  Id.

106.  He also claims that he never told Defendants Ostendorp and Cox that he was in violation of the terms of his probation, that he was afraid of going to jail, or that he would commit suicide if he had to go to jail.[12/]  Id at 223.  Plaintiff states that he

_____

[12/] While the Court in articulating "Plaintiff's Version of the Facts" recites statements from Plaintiff's deposition testimony, the Court also notes that Plaintiff's SAC, inter alia, makes the following allegations:

(1) On or about October 1, 2009 on the Island of Oahu, Mr. Young and Defendant [Roberta Young] consulted with Defendant Ostendorp and Defendant Cox to obtain legal advice for Mr. Young regarding Defendant HIHS' illegal entry into Mr. Young's home and the illegal seizure of Mr. Young's dogs, and potential criminal charges against Mr. Young. SAC at 9-10 ¶ 31.

(2) On or about October 2, 2009, on the island of Oahu, Mr. Young and Defendant [Roberta Young] again consulted with Defendant Ostendorp and Defendant Cox to obtain legal advice for Mr. Young regarding Defendant HIHS.  Id at 10 ¶ 34.

(3) On or about October 5, 2009, Defendant Ostendorp and Defendant Cox travelled with Mr. Young to Hawaii Island for further consultation and to investigate his legal difficulties with Defendant HIHS.  Id at ¶ 36.

(4) During this October 5, 2009, trip to Hawaii Island, Defendant Ostendorp met with Starr Yamada at the Hawaii Island Humane Society to discuss the allegations against Mr. Young for animal cruelty.  Id at 11, ¶ 38.

(5) On or about October 7, 2009, Defendant Ostendorp and Defendant [Roberta Young] signed a retainer agreement.  The scope of the agreement provided for "representing you in protecting your financial assets, reducing your financial liability and to help to keep Warne Keahi Young out of jail.  Id at ¶ 40.

(6) On or about October 8, 2009, Mr. Young met with Defendant Ostendorp and Defendant Cox.  During this meeting Defendant Ostendorp advised Mr. Young that he could be
(continued...)

-13-

never signed the general POA transferring his rights to Roberta

Young or giving Roberta Young the legal right to transfer his

property.  HIHS Defs.' MSJ Ex. F at 168, ECF No. 98.  He also

contends that the Surrender Form did not legally surrender his

dogs seized from his property.  Id at 172.

However, the Court notes that Plaintiff does admit to

(1) calling Ostendorp for legal assistance regarding seizure of

the Dogs, (2) meeting with Ostendorp, Cox, Dela Cruz, and Roberta

Young at the Waikiki Yacht Club on October 1 and October 8, (3)

learning that Roberta Young hired Ostendorp to keep Plaintiff out

of jail, and (4) signing a general power of attorney dated

October 8, 2009, that would give Roberta Young authority to

---

12/ (...continued)
incarcerated for twenty-seven (27) years.  Defendant
Ostendorp conveyed a plan to Mr. Young.  The plan was to
have Dr. Slomoff, a psychologist at Queen's Medical Center,
declare Mr. Young unfit and have Mr. Young voluntarily
commit himself to a mental institution.  Id at 12, ¶ 44.

(7) Mr. Young ultimately decided not to meet with Dr.
Slomoff or voluntarily commit himself.  Id at ¶ 45.

(8) On or about October 12, 2009, Defendant Ostendorp met
again with Mr. Young and Defendant [Roberta Young] to
further discuss Mr. Young's legal matters.  Id at 13, ¶ 47.

(9) Using the forged Power of Attorney, Defendant [Roberta
Young] completed an HIHS animal surrender form certifying
that she was the rightful owner of the animal(s) seized from
Mr. Young's residence.  Id at 16, ¶ 66.

(10) Defendant [Roberta Young] completed the Animal
Surrender Policy form and returned the same to Defendant
Ostendorp, who in turn transmitted the forms to Defendant
HIHS.  Id at ¶ 68.

exercise his legal rights in the event that Plaintiff was declared "not mentally fit" by a psychiatrist. Plntf.'s Supp. JCSF Ex. 4 at 000020, ECF Nos. 154 & 155, Plntf.'s Supp. JCSF Ex. 6 at 1, ECF No. 121. Additionally, Plaintiff's Exhibit 4, a copy of a Hawaiʻi AG report, indicates that Ostendorp told Yamada that he was representing Plaintiff, that Plaintiff was under suicide watch, and that Ostendorp as Plaintiff's attorney wanted to "work this out" to prevent Plaintiff from violating his probation. Plntf.'s Supp. JCSF Ex. 4 at 000016, ECF Nos. 154 & 155. Plaintiff's Exhibit 4 also states that a woman purported to be Roberta Young called Yamada and indicated that she had a signed power of attorney signed by Plaintiff and desired to surrender the Dogs. Id; see Plntf.'s Supp. Opp. at 3, ECF No. 156.

### STANDARD

A party may move for summary judgment on any claim or defense - or part of a claim or defense - under Federal Rule of Civil Procedure ("Rule") 56. Summary judgment "should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Maxwell v. Cnty. of San Diego, 697 F.3d 941, 947 (9th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). Under Rule 56, a "party asserting that a fact cannot be or is genuinely disputed must support the assertion," either by "citing to particular parts of materials in the record" or by "showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

The substantive law determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." Nat'l Ass'n of Optometrists & Opticians v. Harris, 682 F.3d 1144, 1147 (9th Cir. 2012). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Scott v. Harris, 550 U.S. 372, 380 (2007) (citation omitted).

A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." United States v. Arango, 670 F.3d 988, 992 (9th Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). Conversely, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott, 550 U.S. at 380.

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact. Avalos v.

Baca, 596 F.3d 583, 587 (9th Cir. 2010).[13/]  If the moving party satisfies its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Sluimer v. Verity, Inc., 606 F.3d 584, 587 (9th Cir. 2010).  The nonmoving party must present evidence of a "genuine issue for trial," Fed. R. Civ. P. 56(e), that is "significantly probative or more than merely colorable."[14/] LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1137 (9th Cir. 2009) (citation omitted).  Summary judgment will be granted against a party who fails to demonstrate facts sufficient to establish "an element essential to that party's case and on which that party will bear the burden of proof at trial." Parth v. Pomona Valley

---

[13/] When the party moving for summary judgment would bear the burden of proof at trial, the movant must present evidence which would entitle it to a directed verdict if the evidence were to go uncontroverted at trial. Miller v. Glenn Miller Prods., 454 F.3d 975, 987 (9th Cir. 2006) (citation omitted).  In contrast, when the nonmoving party would bear the burden of proof at trial, the party moving for summary judgment may meet its burden by pointing out the absence of evidence from the nonmoving party.  Id. (citation omitted).

[14/] The Ninth Circuit has noted that "Legal memoranda and oral argument, in the summary-judgment context, are not evidence, and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." Flaherty v. Warehousemen, Garage and Service Station Emp. Local Union No. 334, 574 F.2d 484, 486 n.2 (9th Cir. 1978), see also Barcamerica Intern. USA Trust v. Tyfield Importers, 289 F.3d 589, 593 n.4 (9th Cir. 2002).  Additionally, allegations in the plaintiff's complaint "do not create an issue against a motion for summary judgment supported by affidavit." Flaherty, 574 F.2d at 486 n.2.

Hosp. Med. Ctr., 630 F.3d 794, 798-99 (9th Cir. 2010 (citation omitted).

When evaluating a motion for summary judgment, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." Scott v. Harris, 550 U.S. 372, 378 (2007).  The court may not, however, weigh conflicting evidence or assess credibility.  In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008).[15/] Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied.  Anderson, 477 U.S. at 250-51.

## DISCUSSION

## I. Whether This Court Should Grant the HIHS Defendants' MSJ as to Plaintiff's 42 U.S.C. § 1983 Claims

Plaintiff's SAC alleges, inter alia, that the HIHS Defendants violated Plaintiff's constitutional rights under the Fourth, Fifth, and Fourteenth Amendments by seizing and disposing

---

[15/]  Nonetheless, a "conclusory, self-serving affidavit" that lacks detailed facts and supporting evidence may not create a genuine issue of material fact.  F.T.C. v. Neovi, Inc., 604 F.3d 1150, 1159 (9th Cir. 2010).  Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380.  "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012).

of the Dogs.  SAC at 22-25.  Accordingly, Plaintiff seeks relief under 42 U.S.C. § 1983.  Id.  To prevail on a § 1983 claim, Plaintiff must prove two essential elements:  (1) "that a right secured by the Constitution or laws of the United States was violated," and (2) "that the alleged violation was committed by a person acting under the color of State law."  Long v. Cnty. of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).  The HIHS Defendants do not contest that they were acting under the color of state law.  See HIHS Defs.' MSJ at 10-18, ECF No. 98.  The HIHS Defendants only contest the first element by arguing that they did not violate Plaintiff's constitutional rights.

The Court also notes that Plaintiff's § 1983 claims in the SAC and the § 1983 discussion in his Opposition refer only to the Dogs and do not discuss other property mentioned in the state tort law claims of the SAC and the MSJ briefs.  See SAC Counts I-IV and Plntf.'s HIHS MSJ Opp. at 4-13.  Accordingly, the Court only examines the HIHS Defendants and Defendant Ostendorp's conduct regarding the Dogs when considering the § 1983 claims.

**A. Whether the HIHS Defendants Violated Plaintiff's Constitutional Rights**

**1. Whether the HIHS Defendants Violated Plaintiff's Fourth Amendment Rights**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures." <u>U.S. v. Place</u>, 462 U.S. 696, 700 (1983).  A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." <u>Soldal v. Cook Cnty, III</u>, 506 U.S. 56, 68 (1992).  "In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." <u>Id</u> at 701. Destruction of property originally obtained through a lawful search and seizure may constitute a violation of the Fourth Amendment.  <u>See</u> <u>U.S. v. Jacobsen</u>, 466 U.S. 109, 124-25 (1984) (noting that a field test that destroyed a small quantity of powder violated the owner's possessory interest).

Plaintiff alleges that Officer Yamada violated his Fourth Amendment rights because (1) she was not statutorily authorized to apply for and execute the Search Warrant, and (2) "the continued illegal seizure of [Plaintiff's Dogs] . . . effectively deprived [Plaintiff] of his 4th Amendment rights." Plntf.'s HIHS Opp. at 5-6.  The Court will address each argument in turn.

Plaintiff argues that HIHS officers do not have authority to apply for or execute search warrants under Hawai'i statutory law.  Plntf.'s HIHS Opp. at 5.  Contrary to Plaintiff's

-20-

erroneous interpretation of the statutory language, HIHS officers may apply for and execute search warrants as officers of the state. According to Haw. Rev. Stat. § 711-1109.1 (1993 & Supp. 2009), a law enforcement officer who obtains a valid search warrant may impound a pet animal, among other things. The statute defines "law enforcement officer" according to H.R.S. § 710-1000 (1993 & Supp. 2009), which provides the following definition:

> any public servant, whether employed by the State or
> subdivisions thereof . . . vested by law with a duty to
> maintain public order, to make arrests for offenses or
> to enforce the criminal laws, whether that duty extends
> to all offenses or is limited to a specific class of
> offenses.

H.R.S. § 710-1000 defines a "public servant" as "any officer or employee of any branch of government . . . *and* any person participating as advisor, consultant, or otherwise, in performing a governmental function." H.R.S. § 710-1000 (emphasis added).

Plaintiff argues that Hawaiʻi County Ordinance § 4.9 states that HIHS officers shall not be viewed as an agent or employee of the county; therefore, HIHS officers do not meet the definition of "public servant" in H.R.S. § 710-1000. Id. Plaintiff's interpretation completely disregards the second half of the definition, which includes "any person . . . performing a governmental function." H.R.S. § 710-1000. In this case, the County of Hawaiʻi signed a contract for HIHS to perform the

-21-

governmental function of enforcing animal control laws.  <u>See</u> HIHS

Defs.' Reply Errata Ex. A at 2084, ECF No. 140.

Hawai'i law does not bar such an arrangement; in fact,

the statutory scheme demonstrates that the state legislature

intended to allow organizations like HIHS to perform government

functions to enforce animal control laws.  <u>See</u> H.R.S. § 711-1110

(providing that agents of a society formed or incorporated for

the prevention of cruelty to animals may arrest violators of

animal cruelty laws).  Accordingly, Defendant Yamada had

authority under state law to apply for and execute the Search

Warrant.  Plaintiff does not argue that the Search Warrant lacked

probable cause or is invalid on any other basis.[16/]  <u>See</u> Plntf.'s

HIHS Opp. at 5-6.  Accordingly, Officer Yamada's search and

seizure of the Dogs on September 29, 2009 did not violate

Plaintiff's Fourth Amendment rights because it was performed

under a valid search warrant.

---

[16/] Although Plaintiff asserts in ¶ 95 and ¶ 103 in the SAC
that HIHS seized the Dogs without probable cause, neither his
Opposition nor his concise statements of facts contest the
validity of the Search Warrant.  <u>See</u> <u>generally</u>, Plntf.'s Opp.,
ECF No. 109, Plntf.'s Amended HIHS CSF, ECF No. 145.
Accordingly, Plaintiff fails to raise a genuine issue of material
fact regarding the validity of the Search Warrant and whether
Yamada had probable cause to search his Residence and seize the
Dogs on September 29, 2009.  <u>See</u> <u>Flaherty</u>, 574 F.2d at 486 n.2
(holding that allegations in the plaintiff's complaint "do not
create an issue against a motion for summary judgment supported
by affidavit").

Plaintiff's next argument that Defendant Yamada "seized" the Dogs by disposing of them after the legal seizure is likewise without merit.  The Fourth Amendment does not protect against all seizures by law enforcement officials - in order for a violation to occur, the seizure must be "unreasonable."  Brower v. Cnty. of Inyo, 489 U.S. 593, 599 (1989).  The Fourth Amendment is not violated when an individual consents to relinquish his person or property.  See United States v. Mendenhall, 446 U.S. 544, 557-60 (1980) (plaintiff's Fourth Amendment rights were not violated when she gave voluntary consent to police search), Hester v. United States, 265 U.S. 57, 58 (1924) (no Fourth Amendment violation when police seized jug and bottle abandoned by plaintiff), and Waters v. Howard Sommers Towing, Inc., Civ. No. 10-5296 CAS (AJWx), 2011 WL 2601835 at *8 (C.D. Cal. 2011) (no Fourth Amendment seizure when police retained drivers license voluntarily given by plaintiff).

Officer Yamada received the Surrender Form signed by Roberta Young and the general POA dated September 12, 2009 purportedly signed by Plaintiff conferring "broad and sweeping powers" to Roberta Young to "exercise all of [Plaintiff's] legal rights and powers."  HIHS Defs.' MSJ at Ex. D & E, ECF No. 98. The Surrender Form stated that the signer relinquished ownership of the animals and that HIHS would become the new legal owner. Id at Ex. E.  These documents were transmitted to Officer Yamada

-23-

and HIHS by Ostendorp, an attorney who represented to Yamada and
HIHS that he was acting on Roberta Young and Plaintiff's behalf.
Id at Ex. C; Plntf.'s Supp. JCSF Ex. 4 at 000016, ECF Nos. 154 &
155.  Ostendorp specifically stated that Plaintiff was not the
owner of the Dogs.  HIHS Defs.' MSJ at Ex. C, ECF No. 98.
Additionally, Yamada asked for verification – she requested that
Ostendorp tell the person with the general POA to call Yamada,
and the record reflects that Yamada did in fact receive a call
from a woman purported to be Roberta Young, who stated that she
had a general POA signed by Plaintiff.  Plntf.'s Supp. JCSF Ex. 4
at 000016, ECF Nos. 154 & 155.  Furthermore, Yamada asked
Ostendorp to submit a copy of the signed general POA before HIHS
would take action with respect to the Dogs, and she received a
copy of the general POA.  Plntf.'s Supp. JCSF Ex. 3, ECF No. 121.
Based on these uncontested facts, Officer Yamada concluded that
the Dogs were no longer Plaintiff's property.[17]

Although Plaintiff concedes that the general POA and
Surrender Form were in fact given to Officer Yamada, Plaintiff
argues that the general POA and Surrender Form were invalid
because of fraud and forgery.  Plntf.'s Opp. at 8, ECF No. 109;

---

[17] Plaintiff's arguments that Yamada should be liable merely
because she was somehow involved in the loss of the Dogs
oversimplifies the constitutional law analysis.  Plntf.'s Supp.
Opp. at 3.  The crux of the matter is whether Yamada could
reasonably believe that Plaintiff's purported agents could
surrender the Dogs; if so, then Yamada's seizure was not
unreasonable under the Fourth Amendment.

HIHS Defs.' MSJ Ex. F at 168, ECF No. 98.  Assuming Plaintiff's version of the facts as true - namely that the general POA and Surrender Form were in fact invalid - Officer Yamada's actions did not violate the Fourth Amendment because her disposal of the Dogs was based on a mistake of fact as to the validity of the documents.  A mistake of fact does not automatically result in a conclusion that an officer's conduct constitutes an *unreasonable* seizure.  See Hill v. California, 401 U.S. 797, 802-804 (1971) (officer's mistake of fact in arresting the wrong person did not violate Fourth Amendment), Maryland v. Garrison, 480 U.S. 79, 86-87 (1987) (officer's mistake of fact in searching the wrong premises did not violate Fourth Amendment), and Torres v. City of Madera, 524 F.3d 1053, 1056-57 (9th Cir. 2008) (acknowledging that officer conduct might not violate Fourth Amendment despite mistake of fact).

Plaintiff then presents a barrage of arguments as to why Yamada should have known that Plaintiff did not want to surrender the Dogs - in other words, the crux of Plaintiff's argument is that Yamada's conduct was unreasonable because she *should have detected the alleged fraud*.  See Plntf.'s Supp. Opp. at 2, ECF No. 156 (arguing that Yamada should have challenged the authenticity of the POA).  For a reasonableness inquiry as to whether the Fourth Amendment was violated, the Court examines whether Yamada's conduct was objectively unreasonable under the

circumstances.  See Hill v. California, 401 U.S. 797, 802-804

(1971),[18/] Maryland v. Garrison, 480 U.S. 79, 87 n.11 (1987)("the

mistakes must be those of reasonable men, acting on facts leading

sensibly to their conclusions of probability") and Torres v. City

of Madera, 524 F.3d 1053, 1056-57 (9th Cir. 2008) (holding that

district court should make a finding as to whether officer's

mistake in using a gun instead of a taser was objectively

unreasonable).  Additionally, the Court examines the perspective

of the officer when judging the reasonableness of the mistake and

should take into account the facts and circumstances confronting

him or her.  Torres, 524 F.3d at 1056.

        Plaintiff's contentions do not create a material issue

of fact that Yamada's actions were objectively unreasonable.

Plaintiff argues that the HIHS Defendants should have known that

Roberta Young was not the rightful owner because (1) the animals

had been taken from Plaintiff's Residence, (2) HIHS had numerous

contacts with Plaintiff regarding the care of his animals from

the time of his previous charge of animal cruelty in 2007, and

(3) the HIHS Defendants had interactions with Ostendorp regarding

---

        [18/] In Hill, the Supreme Court, in the context of an
officer's mistaken arrest of the wrong person, held that
"sufficient probability, not certainty, is the touchstone of
reasonableness under the Fourth Amendment and on the record
before us the officers' mistake was understandable and the arrest
a reasonable response to the situation facing them at the time."
Hill, 401 U.S. at 803-04.

the status of the animals.[19/]  Plntf.'s Opp. at 9, ECF No. 109.

Regarding the first two arguments, there is uncontested evidence

in the record that, viewing the situation from Yamada's

perspective, Ostendorp and Roberta Young had authority to

surrender the Dogs in 2009.

Ostendorp "informed Yamada that he was [Plaintiff's]

attorney[20/] and that [Plaintiff] was currently under suicide watch

in a Honolulu hospital."[21/]  Plntf.'s Supp. JCSF Ex. 4 at 000016,

ECF Nos. 154 & 155.  He also stated that "he wanted to work this

out because [Plaintiff] did not want to get into any more trouble

---

[19/] The Court notes that Plaintiff fails to cite to any
exhibits, otherwise point to evidence in the record, or identify
evidence in Plaintiff's Concise Statement of Facts to support
these assertions.  See Plntf.'s Opp. at 9 and Plntf.'s JCSF at 8-
10.  Under FRCP 56(c)(1), the Court is not required to search for
Plaintiff's evidence in the record.  Furthermore, under L.R.
56.1(f), the court has no "independent duty to review exhibits in
their entirety," but is only required to review "those portions
of the exhibits specifically identified in the concise
statements." Nevertheless, the Court has considered the record
and the exhibits that appear to involve these arguments.

[20/] The Court, by examining what Yamada could have known from
the evidence in the record, does not make a factual finding that
an attorney-client relationship actually existed between
Ostendorp and Plaintiff.

[21/] The Court assumes that Ostendorp made these statements to
Yamada because Plaintiff does not contest the content of these
statements.  Plntf.'s Supp. Opp. at 2-3, ECF No. 156.  While the
Court construes the facts in Plaintiff's favor and assumes that
*Plaintiff* never told *Defendants Ostendorp and Cox* that he was in
violation of the terms of his probation, that he was afraid of
going to jail, or that he would commit suicide if he had to go to
jail (see *supra* at 12-13); the Court uses Ostendorp's statements
to Yamada to determine Yamada's viewpoint because Plaintiff does
not contest what *Ostendorp* said to *Yamada*.

since he was still on probation." Id.  Ostendorp later told
Yamada that Roberta Young had a general POA signed by Plaintiff,
and that she wanted to surrender the Dogs based on her authority
to do so.  Id.  Plaintiff fails to identify a material issue of
fact that Yamada had reason to know that Ostendorp's
representations were false and that Ostendorp's request to "work
this out" did not reflect the actual position of Plaintiff or
those apparently authorized to act on Plaintiff's behalf.  Even
if Plaintiff had past encounters with HIHS, Yamada's conclusion
that Plaintiff's purported agents had authority to change his
position with regard to the Dogs was not objectively
unreasonable.

The representations explained above also address
Plaintiff's third argument that Yamada's interactions with
Ostendorp should have alerted her as to any fraudulent activity.
The *content* of the conversations reveals that Yamada performed
her actions with the understanding that she was acting in
alignment with Plaintiff's agents, not contrary to his interests.
In fact, the Court observes that, in one of the conversations
mentioned by Plaintiff, Yamada asked to speak with the woman who
allegedly had the general POA.  Plntf.'s Supp. JCSF Ex. 4 at
000016, ECF Nos. 154 & 155.  A woman identifying herself as
Roberta Young called Yamada on October 7, 2009 to verify that she
had a general POA signed by Plaintiff and wanted to surrender the

Dogs to HIHS.[22]   Id at 000016-17.   Regarding the letter dated October 7, 2009, Ostendorp specifically stated that Plaintiff "is not the owner of the dogs and none of the information regarding this matter should be released to him."   HIHS Defs.' MSJ at Ex. C, ECF No. 98.[23]   Accordingly, based on the explicit representations of Ostendorp and Roberta Young, Yamada's failure

---

[22] Plaintiff argues that the woman purporting to be Roberta Young further stated during the conversation that "she was fearful of [Plaintiff] and did not want him learning that she had surrendered the dogs."   Plntf.'s Supp. JCSF Ex. 4 at 000017. Accordingly, Plaintiff draws the inference that Yamada knew that Plaintiff did not want to surrender the Dogs.   Plntf.'s Supp. Opp. at 3.   However, even such an argument does not make Yamada objectively unreasonable in believing that his agents had authority to transfer the Dogs, especially given the representation that Plaintiff was hospitalized following the seizure of the Dogs.   On October 5, two days before the general POA was submitted to HIHS, Ostendorp told Yamada that Plaintiff was "under suicide watch in a Honolulu hospital."   Plntf.'s Supp. JCSF Ex. 4 at 000016.   The record reflects that Yamada believed this representation because during their October 7th telephone conversation she asked Roberta Young as to Plaintiff's status regarding the suicide watch and was told he was fine.   Id.   In light of Ostendorp's representation to Yamada that Plaintiff was under suicide watch at the hospital on October 5, 2009, Yamada was not unreasonable in assuming that the general POA dated September 12, 2009 and submitted to HIHS on October 7 served a legitimate purpose as opposed to a fraudulent or invalid one. Additionally, the fact that the general POA was dated September 12, 2009 did not give Yamada reason to question the validity of the document because a general POA may be created for various purposes, and the September 12, 2009 date indicated that the document was executed and notarized weeks before the September 29, 2009 seizure of the Dogs.

[23] Plaintiff's counsel in the supplemental opposition brief even acknowledges that Ostendorp told Yamada that Plaintiff was not the owner of the Dogs.   Plntf.'s Supp. Opp. at 2, ECF No. 156.

to detect fraud regarding the general POA and the Surrender Form is not objectively unreasonable.[24/]

As a result, the Court concludes that there has been no Fourth Amendment violation under these circumstances because Plaintiff's evidence does not create a genuine issue of material fact as to whether Yamada's accepting the surrender of the Dogs was objectively unreasonable.  Cf. Pennington v. Penner, 207 F. Supp. 2d 1225, 1241 (D. Kan. 2002) (no § 1983 liability for animal control officer who relied on surrender form to seize animals).

### 2.  Whether the HIHS Defendants Violated Plaintiff's Fifth Amendment Rights

Plaintiff alleges that the HIHS Defendants violated Plaintiff's Fifth Amendment rights because "there was no opportunity or any other means to have HIHS' decision reviewed by the operation of any administrative or judicial process."

---

[24/] Plaintiff also argues that Ostendorp and Dela Cruz used a joint personal account instead of a business account to send Yamada a check for $300.00 to cover the care of the Dogs, and that the reason Ostendorp used a personal was to "hide the transaction from an accounting."  Plntf.'s Supp. Opp. at 3, ECF No. 156.  The Hawai'i AG report does not state whether the bank account is a personal account as opposed to a business account. Plntf.'s Supp. JCSF Ex. 4 at 000017, ECF Nos. 154 & 155. Assuming that Plaintiff's assertion is true, the Court fails to see how Yamada should have known that (1) Ostendorp was trying to hide the transaction from an accounting or (2) Plaintiff's signature on the general POA was forged from the fact that Ostendorp and Dela Cruz issued a check to HIHS from a joint personal account.

Plntf.'s HIHS Opp. at 7, ECF No. 109.  Plaintiff complains that he was not notified that (1) his ownership rights in the Dogs had been terminated and (2) the Dogs would be killed or adopted out. Id.

Regarding Plaintiff's Fifth Amendment claim, this Court grants the HIHS Defendants' MSJ to the extent that Plaintiff alleges a taking under the Takings Clause.  See HIHS Defs.' MSJ at 13, ECF No. 98.  The HIHS Defendants argue that there is no genuine issue of material fact that the existence of the Surrender Form and the general POA demonstrate that HIHS did not unlawfully take Plaintiff's property.  Id at 14, Ex. D, E. Plaintiff fails to respond to this argument in his opposition. See generally Plntf.'s HIHS Opposition, ECF No. 109.  Also, Plaintiff fails to present a material issue of fact that the HIHS Defendants had reason to know of the purported fraud, forgery, or invalidity of the documents.  See supra at 25-30.  Under FRCP 56, summary judgment is proper regarding this claim because Plaintiff fails to identify a genuine issue of material fact for trial.

Moreover, "the Takings Clause is implicated only when the taking in question is for a public use"; it does not apply when the taking is for law enforcement purposes.  Scott v. Jackson, 297 Fed. Appx. 623, 625-26 (9th Cir. 2008), see also Bennis v. Michigan, 516 U.S. 442, 448 (1996).  Plaintiff neither alleges in his SAC nor states in his opposition that the HIHS

Defendants acquired the Dogs for public use as opposed to law enforcement purposes.  See generally SAC and Plntf.'s HIHS Opposition, ECF No. 109.

The Court also grants the HIHS Defendants' MSJ regarding Plaintiff's claims under the Due Process Clause of the Fifth Amendment.  The Ninth Circuit has held that "[t]he Due Process Clause of the Fifth Amendment and the equal protection component thereof apply only to actions of the federal government – not to those of state or local governments." Lee v. City of Los Angeles, 250 F.3d 668, 687 (9th Cir. 2001).  Plaintiff has presented claims only against the County of Hawai'i and private actors in his SAC; therefore, the Fifth Amendment Due Process Clause does not apply.  See id and Souza v. Cnty. of Haw., 694 F. Supp. 738, 750 (D. Haw. 1988).

### 3. Whether the HIHS Defendants Violated Plaintiff's Fourteenth Amendment Due Process Rights

The Fourteenth Amendment Due Process Clause provides that the government may not "deprive any person of life, liberty, or property, without due process of law." Daniels v. Williams, 474 U.S. 327, 331 (1986).  However, for both substantive and procedural due process, "this guarantee of due process has been applied to deliberate decisions of government officials to

deprive a person of life, liberty, or property."[25/]  Id and Cnty.
of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).  Souza v. Cnty.
of Haw., 694 F. Supp. 738, 746 (D. Haw. 1988).  Because the Due
Process Clause is concerned with protecting people from
government abuses of power, the Supreme Court has held that
negligent conduct by a state official that causes injury does not
constitute a Due Process deprivation.  Id.

     The Ninth Circuit has held that people have a property
interest in pet animals.  San Jose Charter of Hells Angels
Motorcycle Club v. City of San Jose, 402 F.3d 962, 977 (9th Cir.
2005).  However, Plaintiff does not show that the HIHS Defendants
made a deliberate decision to deprive him of the Dogs.  As
mentioned above, Officer Yamada received (1) a general POA signed
by Plaintiff purporting to give Roberta Young broad authority to
exercise his legal rights and (2) a Surrender Form purporting to
transfer legal title to the Dogs from Roberta Young to HIHS.
HIHS Defs.' MSJ at Ex. D. & E, ECF No. 98.

     Even if this Court construes the facts in favor of
Plaintiff that the documents did not actually transfer legal
rights in the Dogs, the HIHS Defendants did not take conscious
action to deprive Plaintiff of his property in violation of his

---

     [25/] Plaintiff does not challenge the statutory procedures
available under state law or the procedures provided in the
municipal code.  See generally SAC and Plntf.'s HIHS Opp., ECF
No. 109.

constitutional rights; rather, the HIHS Defendants passively agreed to Plaintiff's agents' decision[26/] to transfer the Dogs to the HIHS Defendants through the general POA and Surrender Form. Cf. Souza v. Cnty. of Haw., 694 F. Supp. 738, 747 (D. Haw. 1988) (government decision to include condition on permit did not constitute conscious decision to take plaintiff's property).  The HIHS Defendants' conduct might at most constitute negligence or mistake (although the Court by this statement does not make such a ruling) rather than a deliberate decision to deprive Plaintiff of his rights.[27/]  See Preven v. Cnty. of Los Angeles, Civ. No. 11-2340-R (RNB), 2011 WL 2882399 (C.D. Cal. 2011)(adopted as order of the court by Preven v. Cnty. of Los Angeles, Civ. No. 11-2340-R (RNB), 2011 WL 2882853 (C.D. Cal. 2011)) (county officials did not violate plaintiffs' due process rights when officials relied on plaintiffs' signed agreement to restrain

---

[26/] As explained above, the record reflects that Ostendorp, purporting to act as Plaintiff's attorney, asked Yamada "to work this out because [Plaintiff] did not want to get into any more trouble since he was still on probation."  Plntf.'s Supp. JCSF Ex. 4 at 000016, ECF Nos. 154 & 155.  The representations of Ostendorp, whom Yamada did not have reason to know were false, initiated the process of surrendering the Dogs.  See supra at 27-29.

[27/] Furthermore, Yamada could not deliberately dispossess Plaintiff of his interest because Ostendorp represented to Yamada that Plaintiff was "not the owner of the dogs" and the Surrender Form stated that Roberta Young was the owner; Plaintiff identifies no evidence that Yamada had reason to disbelieve Ostendorp.  HIHS Defs.' Ex. C, ECF No. 98; see supra at 27-29.

their dogs even though plaintiffs argued agreement was obtained through duress from third party).

Regarding Plaintiff's substantive due process claim, the HIHS Defendants' conduct does not meet the "shocks the conscience" standard, which is a high standard to meet as illustrated by the Supreme Court's examples of executive abuse of power. The HIHS Defendants' decision regarding whether or not to honor a form submitted by Plaintiff's purported agents is not the type of "egregious official conduct" that is "arbitrary in the constitutional sense." See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)(providing example of stomach pumping as a form of oppression and abuse of power barred by the due process clause). While Plaintiff perhaps may have an action in state tort law against other Defendants for his alleged harm (although the Court by making this statement does not make such a ruling); the HIHS Defendants' actions do not fall within the category of "the large concerns of the governors and the governed" that due process attempts to address. See id at 848-54 (officer that killed passenger in a high-speed car chase did not deprive passenger of due process because intent was "to do his job as a law enforcement officer, not to induce . . . lawlessness, or to terrorize, cause harm, or kill.")

Additionally, regarding Plaintiff's procedural due process claims, a violation of due process will not be found if

-35-

state law provides adequate postdeprivation procedures.  Parratt
v. Taylor, 451 U.S. 527, 538-540 (1981).  The Supreme Court has
noted that, "where only property rights are involved, mere
postponement of the judicial enquiry is not a denial of due
process, if the opportunity given for ultimate judicial
determination of liability is adequate."  Id at 540 (citing
Phillips v. Commissioner, 283 U.S. 589, 596-97 (1931)).  The
Supreme Court has applied this principle to cases where (1) "the
loss is not a result of some established state procedure and the
[s]tate cannot predict precisely when the loss will occur" or (2)
"a predeprivation hearing is unduly burdensome in proportion to
the liberty interest at stake."  Id at 541.

        In this case, Plaintiff's loss was not the result of
some established state procedure, and the HIHS Defendants could
not reasonably predict that fraud or forgery affected the
validity of the form transferring ownership of the Dogs.
Contrast Parratt, 451 U.S. 527, 536-37 (post-deprivation hearing
sufficient where prison officials' loss of plaintiff's package
considered unpredictable) with Zinermon v. Burch, 494 U.S. 113,
133-34 (1990) (predeprivation hearing required because mental
health hospital could forseeably predict that a person needing
mental health care might be incapable of making an informed,
voluntary decision).

Additionally, requiring a predeprivation hearing to verify the validity of every form that purports to voluntarily relinquish property rights would be unduly burdensome in light of the low risk of fraudulent or forged forms.  Cf. Ingraham v. Wright, 430 U.S. 651, 682 (1977) (No predeprivation hearing required for corporal punishment because of "low incidence of abuse . . . and the common-law safeguards that already exist."). The low risk of fraud and forgery combined with sufficient state tort remedies to protect people's interests in their pets merits a conclusion that the Due Process Clause does not require a predeprivation hearing in this type of case.  Id.

Moreover, Plaintiff acknowledges in his Opposition that a tort action for monetary damages can redress Plaintiff's injury from the loss of the Dogs.  Plntf.'s HIHS Opp. at 14, ECF No. 109.  Accordingly, because state tort remedies may provide adequate post-deprivation relief, the HIHS Defendants did not violate Plaintiff's procedural due process rights.[28/]  See

---

[28/] Plaintiff also argues that the HIHS Defendants should have entered the premises to provide food, water, and emergency medical treatment to the Dogs instead of impounding them because state law and the county code provide for alternative actions instead of impoundment.  Plntf.'s HIHS MSJ Opp. at 6.  The Court notes that H.R.S. § 711-1109.1 states that a law enforcement officer may either "enter the premises . . . to provide the pet animal . . . with food, water, and emergency medical treatment, or to impound the pet animal." (emphasis added).  The discretion granted by the word "or" does not mandate that a law enforcement officer must take alternative actions before impoundment.  In this case, the HIHS Defendants would have had to expend
(continued...)

-37-

<u>Parratt</u>, 451 U.S. 543-44, <u>Souza</u>, 694 F. Supp. 738 (noting that state court remedies were sufficient to meet hearing requirement of due process clause), <u>and</u> <u>Anderson v. Smith</u>, Civ. No. 1:06-CV-1795 OWW SMS, 2009 WL 2139311 at *19 (E.D. Cal. 2009) (plaintiff who denied knowingly surrendering her interest in her animals because she did not wear her glasses when she signed the form did not suffer a due process violation because state remedies could redress her injury).

### 4.   Whether the HIHS Defendants Violated Plaintiff's Fourteenth Amendment Right to Equal Protection

Plaintiff asserts that the HIHS Defendants intentionally treated him differently from other similarly situated individuals and that there is no rational basis for the difference in treatment.  SAC at 26-27.  The HIHS Defendants state that the Surrender Form and the general POA demonstrate that the HIHS Defendants did not violate Plaintiff's Fourteenth Amendment right to equal protection.  HIHS Defs.' MSJ at 2-3, ECF No. 98.

---

[28]/ (...continued)
significant time and resources to feed, water, medically treat, and remove feces from the kennels for all seventeen animals; the HIHS Defendants' decision to impound the Dogs is understandable based on these circumstances.  <u>See</u> HIHS Defs.' MSJ Ex. A at 3-4, ECF No. 98.  Moreover, Plaintiff fails to cite any case law stating that impounding pet animals instead of taking alternative actions violates due process.  Plntf.'s HIHS MSJ Opp. at 7, ECF No. 109.

Plaintiff argues a "class-of-one" theory for his Equal Protection Claim.  For the "class-of-one" doctrine, the court determines whether a person has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Engquist v. Oregon Dep't. Of Agriculture, 553 U.S. 591, 602 (2008).  However, the Supreme Court noted that the cases applying the "class-of-one" doctrine involved "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed."  Id. at 602.  In this case, Plaintiff fails to raise a genuine issue of material fact because Plaintiff has not presented any evidence of a clear standard that the HIHS Defendants deviated from when performing their duties.  SAC at 26-27, See generally Plntf.'s HIHS Opp., ECF No. 109.

Moreover, the Supreme Court noted that state actors involved in discretionary decisions do not create a "class-of-one" claim because discretionary decisionmaking involves a "vast array of subjective, individualized assessments," precluding the creation of a standard.  Id at 603.  The Supreme Court specifically noted that officers enforcing laws like traffic laws are considered to be operating in a discretionary function and therefore do not violate the Equal Protection Clause by enforcing the law against some people and not others.  Engquist v. Oregon Dep't. Of Agriculture, 553 U.S. 591, 602 (2008).

The HIHS Defendants' actions as law enforcement officials likewise do not violate the Equal Protection Clause because the HIHS Defendants had discretion with regard to enforcing animal control laws.

Accordingly, because Plaintiff fails to raise a genuine issue of material fact regarding his Equal Protection Claim, this Court grants summary judgment in favor of the HIHS Defendants. See also, Dunham v. Kootenai Cnty., 690 F. Supp. 2d 1162, 1177 (D. Idaho 2010) (court denied equal protection claim involving law officer's seizure of plaintiff's horses).

**B. Whether Defendant Yamada's Actions Are Protected by Qualified Immunity**

The Court concludes that the HIHS Defendants did not violate Plaintiff's constitutional rights, but as an alternative basis for deciding the constitutional claims, the Court will consider whether or not Officer Yamada is entitled to protection under the doctrine of qualified immunity. Officer Yamada raises the defense of qualified immunity as to Plaintiff's § 1983 Fourth, Fifth, and Fourteenth Amendment claims because the actions forming the basis of this suit were performed in the course of her official duties. HIHS Defs.' MSJ at 15-17, ECF No. 98, SAC at 23. Because qualified immunity protects Officer Yamada's actions, this Court GRANTS summary judgment as to Plaintiff's federal claims against Officer Yamada.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). "The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." <u>Id.</u>

When examining a claim of qualified immunity, the court may use a two part test by examining (1) "whether the facts that a plaintiff has alleged make out a violation of a constitutional right" and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." <u>Id</u> at 232. The Supreme Court has held that courts "may grant qualified immunity on the ground that a purported right was not "clearly established" by prior case law, without resolving the more difficult question whether the purported right exists at all." <u>Reichle v. Howards</u>, – U.S. –, 132 S. Ct. 2088, 2093 (2012)(citing <u>Pearson</u>, 555 U.S. at 236). When examining whether a right has been "clearly established," the right allegedly violated must be established "not as a broad general proposition, but in a particularized sense so that the contours of the right

-41-

are clear to a reasonable official." _Reichle v. Howards_, 132 S. Ct. at 2094.

In this case, the Court already examined the first prong of the qualified immunity test in Section I.A. and concluded that the HIHS Defendants did not violate Plaintiff's constitutional rights. _See supra_ at 19-39. However, even if the HIHS Defendants had committed a violation, _Reichle_ indicates that Officer Yamada would still be protected from liability if the right was not "clearly established" during the time of the violation. _See_ _id._ Accordingly, the Court examines the second prong of whether the constitutional rights identified by Plaintiff were clearly established during the time of the alleged violation.

**1. Whether the Doctrine of Qualified Immunity Applies to Hawaii Island Humane Society Officers**

As an initial issue, Defendant Yamada is employed by the Hawaii Island Humane Society, which is an independent contractor hired by the County of Hawaiʻi to carry out the "County's animal control program" under Hawaiʻi County Code and the Hawaiʻi Revised Statutes. HIHS Defs.' Errata Ex. A at 2079, ECF No. 140. The Supreme Court has held that private defendants are not covered by immunity unless "firmly rooted tradition" and "special policy concerns involved in suing government officials" warrant immunity. _Richardson v. McKnight_, 521 U.S. 399, 404

(1997).  In this case, Officer Yamada qualifies for qualified immunity.

In <u>Filarsky v. Delia</u>, the Supreme Court noted that historical tradition supports qualified immunity for "individuals engaged in law enforcement activities, such as sheriffs and constables."  132 S. Ct. 1657, 1664 (2012).  "[A]t common law, a special constable, duly appointed according to law, had all the powers of a regular constable so far as may be necessary for the proper discharge of the special duties intrusted to him, and in the lawful discharge of those duties, was as fully protected as any other officer."  <u>Id.</u>  The Supreme Court also noted that sheriffs executing warrants were allowed under common law to enlist the aid of private individuals in order to do so.  <u>Id.</u>  Under common law, a private individual had the same authority of the sheriff and was protected to the same extent.  <u>Id.</u>

In this case, state and county law demonstrates that officers of HIHS like Defendant Yamada are duly appointed by law to execute search warrants and perform law enforcement functions like those of the police.  <u>See</u> Haw. Rev. Stat. § 711-1109.1(1) & (4).  Hawaiʻi state law also directly provides that HIHS officers may "make arrests and bring before any district judge thereof offenders found violating the provisions of section 711-1109 to be dealt with according to law."  Haw. Rev. Stat. § 711-1110. Additionally, the Humane Society's contract with the Hawaiʻi

County Police Department ("HCPD") provides, inter alia, (1) HIHS requires agreement with HCPD before it may change facility hours or patrol hours; (2) HIHS is required to respond to HCPD dispatch requests and to make dispatch requests to HCPD when HIHS is contacted by the public; (3) HIHS is to coordinate with HCPD regarding after-hours responses by police officers to public requests regarding animals; (4) HCPD will offer training, including the attempt to "coordinate training with an ongoing police recruit class"; (5) HIHS will submit quarterly reports of activities, revenues, and expenses to the HCPD police chief; (6) HIHS will keep a system of records regarding communications with HCPD and the public; and (7) HIHS must submit its administrative procedures regarding enforcement, investigation, and shelter operations to HCPD for review and approval.  HIHS Defs.' Errata to MSJ Ex. A at 2085-2089, ECF No. 140.  The statutory provisions, close collaboration between HIHS and the HCPD, and HCPD's power to review HIHS procedures merits a conclusion that officers of HIHS are private actors enlisted by the police department to exercise police powers to discharge special public duties.  See id.  Accordingly, in this situation, the private actors also enjoy the same protections afforded to law enforcement officers.

     Additionally, "special policy concerns" support granting HIHS officers qualified immunity in this case.  Animal

-44-

control officers, like police officers, should be encouraged to perform their public duties without "unwarranted timidity" that may decrease their effectiveness in responding to public danger. Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982) ("[T]here is the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties."). This concern particularly applies to the type of work required by the HIHS and HCPD contract, which includes HCPD and fire department emergency calls, animal attacks by uncontained animals, and public safety situations. See HIHS Defs.' Errata to MSJ Ex. A at 2087, ECF No. 140.

In Filarsky, the Supreme Court also noted that private individuals who work in close coordination with public employees may face threatened legal action for the same conduct. 132 S. Ct. at 1666. While government employees would be protected by some form of immunity; private individuals would face "full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." Id. In such cases, private individuals may be deterred from accepting such assignments. This special policy concern applies in this case, where HIHS officers are required to accompany HCPD officers upon request. HIHS Defs.' Errata to MSJ Ex. A at 2089, ECF No. 140.

-45-

Additionally, the Supreme Court noted that in situations where private individuals work with government employees, lawsuits filed against private individuals for conduct performed in conjunction with government employees will likely embroil government employees as well, distracting them from their duties.  Filarsky, 132 S. Ct. at 1666 (noting that government employees are likely to be called to testify in the private individual's lawsuit).  HCPD and HIHS are likely to face such embroilment based on the collaboration required under the contract as explained above.  See supra at 43-44.  In conclusion, the nature of the relationship between HIHS and HCPD combined with the historical background of private individuals employed by law enforcement officers establishes that Officer Yamada is protected by qualified immunity in this case.

While the Supreme Court held in Richardson v. McKnight that private contractor prison guards are not covered by qualified immunity; that case is distinguishable from Defendant Yamada's case because the Court found that "firmly rooted tradition" did not support a finding of qualified immunity for private contractor prison guards.  521 U.S. 399, 404 (1997).  Regarding the second prong of "special policy concerns," the Supreme Court noted that the prison had competitive market pressures to provide incentives to avoid timid or fearful performance.  Id at 409-410.  While HIHS as an independent

-46-

contractor may also have competitive market pressures; the Court in Richardson noted that the prison performed its task "independently, with relatively less ongoing direct state supervision." Id at 409 (noting that the private prison was exempted from monitoring or inspections). Such freedom allowed the private contractor prison to respond to market pressures to adjust employee behavior. See id at 410. In this case, there is close government collaboration and supervision that restricts HIHS's ability to respond as a private firm to market pressures. See supra at 43-44. Accordingly, the Court concludes that Defendant Yamada is protected by qualified immunity because of HCPD's collaboration with HIHS and its supervision over HIHS' work.

**2. Whether the Doctrine of Qualified Immunity Protects Officer Yamada as to Plaintiff's Fourth Amendment Claims**

Plaintiff's argument that Defendant Yamada violated Plaintiff's Fourth Amendment rights by disposing of the Dogs does not overcome Officer Yamada's protection under the doctrine of qualified immunity. See Plntf.'s HIHS Opp. at 6, ECF No. 109. While the Fourth Amendment generally prevents "meaningful interference with an individual's possessory interests" in his property (Soldal v. Cook Cnty, III, 506 U.S. 56, 68 (1992)); Officer Yamada argues that, at the time HIHS disposed of the

-47-

Dogs, she reasonably assumed that Plaintiff Young did not have a possessory interest in the Dogs. HIHS Defs.' MSJ at 6-7, ECF No. 98, HIHS Defs.' Reply at 5-6, ECF No. 139.

As mentioned in Section I.A. above, the Court concludes that Officer Yamada did not violate the Fourth Amendment because a reasonable officer could have believed that Roberta Young had the authority to execute a Surrender Form for the Dogs based on the general POA.  _See_ _supra_ at 25-30.  However, even if Officer Yamada's actions constituted a violation of Plaintiff's Fourth Amendment rights, qualified immunity would apply because Plaintiff's Fourth Amendment rights were not "clearly established" during the time of Officer Yamada's actions.  _See_ Torres, 524 F.3d at 1057 n.5 (holding that, even if an officer acted unreasonably, the officer may be entitled to qualified immunity if it was not clearly established that the objective unreasonableness of the conduct violated constitutional rights).

There is no clear statute or court precedent that an animal control officer violates constitutional rights by relying on facially valid forms consenting to the transfer of ownership of property to the government.  _See_ Pennington v. Penner, 207 F. Supp. 2d 1225, 1241 (D. Kan. 2002) (qualified immunity protected animal control officer who relied on plaintiff's agreement to relinquish horses even though plaintiff alleged agreement was obtained under duress).  Accordingly, in the absence of explicit

statutory or case law, the contours of Plaintiff's Fourth
Amendment rights in this case were not "sufficiently clear that a
reasonable official" would understand that accepting the validity
of the Surrender Form and the general POA would violate
Plaintiff's constitutional rights. <u>See id</u>; <u>cf.</u> <u>James v.
Rowlands</u>, 606 F.3d 646, 652 (9th Cir. 2010).[29]

        Plaintiff fails to identify a genuine issue of material
issue of fact as to whether Yamada violated a "clearly
established" right. <u>See</u> Plntf.'s HIHS MSJ Opp. at 9-10, ECF No.
109. If reasonably competent officials could disagree about
whether or not the Surrender Form and general POA legitimately
divested Plaintiff of his ownership in the Dogs, then qualified
immunity should be recognized. <u>KRL v. Moore</u>, 384 F.3d 1105, 1115
(9th Cir. 2004) ("the relevant, dispositive inquiry . . . is
whether it would be clear to a reasonable officer that his
conduct was unlawful in the situation he confronted"); <u>Cf.</u> <u>Malley
v. Briggs</u>, 475 U.S. 335, 341 (1986) ("Defendants will not be
immune if, on an objective basis, it is obvious that no
reasonably competent officer would have concluded that a warrant

---

[29] In <u>James</u>, the plaintiff father alleged that county
employees violated his substantive and procedural due process
rights by failing to notify him of an investigation regarding an
alleged molestation of his daughter. 606 F.3d at 648. The Ninth
Circuit found that the county employees were entitled to
qualified immunity because the plaintiff did not identify any
authority establishing that a parent had a right to be informed
when officials investigate allegations that a child has been
molested. <u>Id</u> at 652-53.

should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.").

While Plaintiff may contest what *he* actually stated to *Ostendorp* (*supra* at 12-13), Plaintiff does not contest what *Ostendorp* said to *Yamada*, which is a key factor in the inquiry for determining the objective reasonableness of Yamada's conduct. See Anderson v. Creighton, 483 U.S. 635, 641 (1987) (holding that an examination of objective reasonableness of an official's conduct will "often require examination of the information possessed by the . . . officials"). The conversations between Yamada and Ostendorp presented in Plaintiff's own exhibit illustrate that Ostendorp, representing himself to be Plaintiff's attorney, indicated that the Dogs would willingly be surrendered to prevent Plaintiff from getting into more trouble while on probation. Plntf.'s JCSF Ex. 4 at 000016, ECF Nos. 154 & 155. Plaintiff does not refute the content of these conversations.

Plaintiff makes specific arguments about (1) comments in a letter Yamada received from Ostendorp and (2) a conversation between Yamada and a woman who called on October 7, 2009 and represented herself to be Roberta. Plntf.'s Supp. Opp. at 2-3, ECF No. 156. While the letter shows that Ostendorp asked Yamada not to notify Plaintiff about the Dogs, Plaintiff ignores the part of the letter where Ostendorp represents to Yamada that the Dogs *no longer belonged to Plaintiff*. HIHS Defs.' MSJ Ex. C, ECF

No. 98.  As a result, this evidence fails to create a material

issue of fact as to whether Yamada violated a "clearly

established" constitutional right because reasonable officers

could certainly disagree as to whether Plaintiff had a possessory

interest under the Fourth Amendment.

          In the October 7th phone call to Yamada, the woman

purported to be Roberta stated that she had a general POA signed

by Plaintiff and wanted to surrender the Dogs to HIHS.  During

the conversation, she also stated that "she was fearful of

[Plaintiff], and did not want him learning that she had

surrendered the dogs."  Plntf.'s Supp. JCSF Ex. 4 at 5, ECF Nos.

154 & 155.  However, as mentioned previously, Yamada was not

objectively unreasonable in believing that Plaintiff's purported

agents had authority to transfer the Dogs, especially given the

representation that Plaintiff was hospitalized following the

seizure of the Dogs.  On October 5, two days before the general

POA was submitted to HIHS, Ostendorp told Yamada that Plaintiff

was "under suicide watch in a Honolulu hospital."  Plntf.'s Supp.

JCSF Ex. 4 at 000016, ECF Nos. 154 & 155.  The record reflects

that Yamada believed this representation because during the

October 7th telephone call, she asked Roberta Young as to

Plaintiff's status regarding the suicide watch and was told he

was fine.  Id.  The fact that the general POA was dated September

12, 2009 did not give Yamada reason to question the validity of

-51-

the document because a general POA may be created for various purposes; furthermore, the September 12, 2009 date indicated that the document was executed and notarized some time before the September 29, 2009 seizure of the Dogs.

In light of Ostendorp's representation to Yamada that Plaintiff was under suicide watch at the hospital on October 5, 2009, Yamada was not unreasonable in assuming that the general POA dated September 12, 2009 and submitted to HIHS on October 7 served a legitimate purpose as opposed to a fraudulent or invalid one.  Nor is the law clearly established that, under these circumstances, Yamada erred by relying on the general POA.  C.f. Olsen v. Spallone, 34 Fed. Appx. 800, 801 (2d Cir. 2002) (daughter who held power of attorney for her father could consent to police search of home); Mitchell v. Houston, No. 3:10-CV-01803-G(BF), 2011 WL 5008399 at *5 (N.D. Tex. 2011) (person with power of attorney executed before alleged illegal search validly consented to police search of home).

Accordingly, Defendant Yamada is protected by qualified immunity and is entitled to summary judgment on Plaintiff's Fourth Amendment claim.

**3. Whether the Doctrine of Qualified Immunity Protects Officer Yamada as to Plaintiff's Fifth and Fourteenth Amendment Due Process Claims**

As mentioned above, the Court concludes that Defendant Yamada did not violate Plaintiff's due process rights.  See *supra* Section I.A.2-I.A.3 at 32-38.  However, even if Defendant Yamada had actually violated Plaintiff's due process rights to notice, qualified immunity still applies because Plaintiff's rights were not "clearly established" at the time of the violation.  The Surrender Form and the general POA appeared to give Roberta Young authority to surrender the Dogs to HIHS.  See HIHS Defs.' MSJ at Ex. C, D, E, ECF No. 98.  At that point, Yamada did not violate a "clearly established" right because the Dogs no longer appeared to belong to Plaintiff.  See id.  Plaintiff does not identify any clear precedent or law that would provide notice to Defendant Yamada that her failure to notify a person who apparently no longer had rights to the Dogs was unlawful.  See Pennington v. Penner, 207 F. Supp. 2d 1225, 1241 (D. Kan. 2002) (holding that an animal control officer did not violate a "clearly established" constitutional right by seizing a horse after the plaintiff consented to surrendering the herd).

**4.   Whether the Doctrine of Qualified Immunity Protects Officer Yamada as to Plaintiff's Fourteenth Amendment Equal Protection Claims**

As noted above in Section I.A.4., Plaintiff has not raised a genuine issue of material fact as to whether the HIHS Defendants violated his Fourteenth Amendment rights to equal

protection of the laws.  _See_ _supra_ at 38-39.  Plaintiff fails to
identify evidence that a clear standard existed, which is a
prerequisite to the inquiry of whether a deviation occurred from
that standard.  _See_ Enqquist v. Oregon Dep't. Of Agriculture, 553
U.S. 591, 602 (2008) (noting that, for a class-of-one theory to
apply, a plaintiff must demonstrate the "existence of a clear
standard against which departures, even for a single plaintiff,
could be readily assessed").  Without evidence of a clear
standard, Plaintiff cannot demonstrate that his right to Equal
Protection in this case was "clearly established."  _Cf._ Dunham v.
Kootenai Cnty., 690 F. Supp. 2d 1162, 1177 (D. Idaho 2010) (court
denied equal protection claim involving law officer's seizure of
plaintiff's horses).  Accordingly, qualified immunity protects
Officer Yamada as to this claim.

**C.  Whether This Court Should Grant Defendant Whitaker's MSJ
    as to Plaintiff's 42 U.S.C. § 1983 Claims**

Plaintiff alleges the Defendant Whitaker should be
liable because she is generally "responsible for the overall
operations" of HIHS shelters and generally "responsible for the
fulfillment of HIHS's animal-related contract with the County."
Even if the Court accepts these facts as true, Defendant Whitaker
is entitled to summary judgment because Plaintiff fails to raise
a genuine issue of material fact as to whether Whitaker

-54-

personally participated in any alleged constitutional rights violation.

First, Plaintiff has not identified a genuine issue of material fact as to whether his constitutional rights were violated as discussed in Section I.A.  *Supra* Section I.A. at 19-39.

Second, there is no respondeat superior liability under § 1983.  <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).[30/] "A supervisor is only liable for the constitutional violations of . . . subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  <u>Id.</u>  According to the Supreme Court, "a plaintiff must plead that each [] defendant, through the official's own individual actions, has violated the Constitution."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009).

In this case, Plaintiff presents no evidence that Defendant Whitaker personally participated in, directed, or had knowledge of Defendant Yamada's search and subsequent acceptance

---

[30/] While Defendant Whitaker is a supervisor at HIHS, a private contractor; the Ninth Circuit extended the holding that there is no respondeat superior liability under § 1983 to cases involving private contractors acting under color of state law.  <u>Tsao v. Desert Palace, Inc.</u>, 698 F.3d 1128, 1138-39 (9th Cir. 2012).  Accordingly, the cases examining municipal liability in the § 1983 context apply to this case involving a private contractor acting under color of state law.  <u>See id</u> at 1143-45 (using municipality cases to examine private contractor liability under § 1983).

of the Surrender Form and the general POA.  See Plntf.'s HIHS MSJ Opp. at 11-12, ECF No. 109.  Plaintiff also does not provide evidence of deficient training procedures or supervisory actions. Id.  Imposing liability on Defendant Whitaker merely because of her responsibilities for operations and staff development is equivalent to imposing liability because of her status as a supervisor - a conclusion that is impermissible under Supreme Court jurisprudence.  See Board of Cnty. Commissioners of Bryan Cnty, Oklahoma v. Brown, 520 U.S. 397, 405 (1997) (official's mere responsibility for decision to hire tortfeasor, without more, is insufficient for § 1983 liability), Taylor, 880 F.2d at 1045 (official's status of lieutenant in charge of security unit where plaintiff was housed did not meet requirements for liability under § 1983).

Plaintiff argues that even if Defendant Whitaker "did not make a deliberate choice to wrongfully deprive Mr. Young of the rights to his animals, she certainly ratified that decision when she took no steps to rectify the situation."  Plntf.'s HIHS MSJ Opp. at 12, ECF No. 109.  As an initial matter, Plaintiff does not provide evidence that Whitaker is a policymaker with "final decision making authority," which is required for liability under § 1983.  Plntf.'s HIHS MSJ Opp. at 11-12; See Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) ("Municipal liability attaches only where the decisionmaker

possesses final authority to establish municipal policy with respect to the action ordered."). Plaintiff's recitation of Whitaker's general responsibilities as a director does not establish that Whitaker is the final decisionmaker with respect to consent form procedures.

Moreover, Plaintiff's own cases explain that ratification requires an entity policy maker to approve "the decision and the basis for it." Fuller v. City of Oakland, Cal., 47 F.3d 1522, 1534 (9th Cir. 1995), City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."), Hammond v. Cnty. of Madera, 859 F.2d 797, 802 (9th Cir. 1988)(overruled on other grounds by Wood v. Ostrander, 851 F.2d 1212 (9th Cir. 1988)). Contrary to Plaintiff's assertion, mere inaction does not form a basis for ratification; there must be evidence of a deliberate choice or approval of the decision at issue. See Gillette v. Delmore, 979 F.2d 1342, 1348 (9th Cir. 1992) (noting that the official must play some active participation or make a deliberate choice to endorse both the decision and the basis for it). Plaintiff has not provided any evidence of an affirmative act on the part of Whitaker that would subject her to liability.

Lastly, the doctrine of qualified immunity would protect Defendant Whitaker for the same reasons Officer Yamada is protected.  <u>See</u> Section I.B. *supra* at 40-54.  Even if Plaintiff provided evidence of a specific act performed by Whitaker, Plaintiff has not demonstrated that his constitutional rights were "clearly established" at the time that Whitaker allegedly violated his rights.  <u>Id.</u>  Accordingly, this Court grants Whitaker's MSJ for the § 1983 claims.

**D. Whether this Court Should Grant Defendant HIHS's MSJ as to Plaintiff's § 1983 Claims**

Plaintiff alleges claims against HIHS for violating Plaintiff's constitutional rights under the Fourth, Fifth, and Fourteenth Amendments.[31]  First, the Court notes that Plaintiff has not identified a genuine issue of material fact as to whether

---

[31] The Court views Plaintiff's claims against Defendant Whitaker "in her official capacity as Executive Director of the Hawaii Island Humane Society" and Defendant Yamada "in her official capacity as Humane Officer" as claims against HIHS. This Court has previously held that "there is no longer a need to bring official-capacity actions against local government officials, for under <u>Monell</u> . . . local government units can be sued directly for damages and injunctive or declaratory relief." <u>Wong v. City and Cnty. of Honolulu</u>, 333 F. Supp. 2d 942, 947 (D. Haw. 2004) (citing <u>Kentucky v. Graham</u>, 473 U.S. 159, 166-67 n.14 (1985)); <u>see also</u> <u>Monell v. Dep't. of Social Serv.</u>, 436 U.S. 658, 690 n.55 (1978) ("official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"); <u>cf.</u> <u>Will v. Michigan Dep't. of State Police</u>, 491 U.S. 58, 71 (1989) (noting that "a suit against a state official in his or her official capacity is not a suit against the official but a suit against the official's office.").

his constitutional rights were violated as discussed in Section I.A. *Supra* Section I.A. at 19-39.

Second, Plaintiff only identifies a single act on the part of HIHS that purportedly violated his constitutional rights - consequently, Plaintiff's evidence fails to meet the test for holding an entity liable under Monell. The Supreme Court stated in Monell v. Dep't of Social Services of New York that municipalities are not liable through respondeat superior or vicarious liability for § 1983 violations of their employees. 436 U.S. 658, 692 (1978). Instead of relying upon employee liability, a plaintiff must demonstrate that there is a municipal policy or custom that caused the plaintiff's injury. Board of Cnty. Commissioners of Bryan Cnty, Oklahoma v. Brown, 520 U.S. 397, 403 (1997) (citing Monell, 436 U.S. at 694)[hereinafter, "Brown"]. Requiring plaintiffs to locate a "policy" ensures that an entity is liable only for deprivations resulting from the decisions of the policy-makers or officials; requiring plaintiffs to locate a "custom" ensures that the entity acting under color of state law is only liable for practices that are "so widespread as to have the force of law." Id at 404.

Although HIHS is not a municipality, the Ninth Circuit has held that the Monell analysis applies to private entities

acting under the color of state law.[32/]  Tsao v. Desert Palace,
Inc., 698 F.3d 1128, 1139 (9th Cir. 2012).  HIHS is a private
contractor acting under color of state law, so the Monell
analysis applies to its actions.

Plaintiff fails to identify a specific policy or custom
that deprived him of his constitutional rights.  See generally
SAC and Plntf.'s HIHS MSJ Opp. at 11-12, ECF No. 109.  Plaintiff
does not allege that the procedures applicable to the Surrender
Form or general POA violate federal law or deprive people of
federal rights; Plaintiff also does not provide evidence of
failure to train.  Plaintiff cannot merely point generically to
conduct "properly attributable to the municipality."  See Brown,
520 U.S. at 404.  He "must also demonstrate that, through its
deliberate conduct, HIHS was the "moving force" behind the injury
alleged."  Id.  HIHS's acceptance of a facially valid form does
not demonstrate that HIHS deliberately deprived Plaintiff of his
constitutional rights through a policy or custom.

Additionally, Plaintiff's specific allegations that his
rights were violated by Yamada's acceptance of the Surrender Form
and the general POA only identifies a single incident of

---

[32/] Because the rationale and analysis of Monell applies, the
Ninth Circuit used municipality cases in order to examine the §
1983 liability of a private contractor acting under color of
state law.  See id at 1143-45 (using municipality cases to
examine private contractor liability under § 1983).  Accordingly,
this Court likewise uses municipality cases to examine HIHS'
liability under § 1983.

purported wrongdoing on the part of HIHS.  The Supreme Court has addressed such single incident cases as follows:

> Where a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high.  Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that this approach is inadequate.  Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause.

Brown, 520 U.S. at 411.

While a single action may create liability, Plaintiff must identify evidence that HIHS was "deliberately indifferent" to the specific risk "that a violation of a particular constitutional or statutory right will follow the decision."  Id at 411, Tsao, 698 F.3d at 1143.  In a case where a sheriff admitted that he failed to conduct further research on an applicant's record before hiring him, the Supreme Court found that the "indifference" to the application was not the type of "indifference" that results in § 1983 liability.  Brown, 520 U.S. at 411.  Instead, the plaintiff had to prove that the official was deliberately indifferent to the violation of the constitutional right that was a "plainly obvious consequence" of the act.  Id.

-61-

In this case, Plaintiff fails to produce evidence that a HIHS policymaker was deliberately indifferent to a violation of his constitutional rights.  Even if the Court assumes without deciding that HIHS was indifferent to investigating the Surrender Form and the general POA, such indifference does not meet the legal standard to impose liability because it was not plainly obvious that the forms were invalid and that accepting them would violate Plaintiff's constitutional rights.  See Pennington, 207 F. Supp. 2d at 1243 (D. Kan. 2002) (granting summary judgment because plaintiff failed to show that deliberate municipal policy or custom deprived plaintiff of his horses) and Anderson v. Smith, Civ. No. 1:06-CV-1795 OWW SMS, 2009 WL 2139311 at *20-21 (E.D. Cal. 2009) (granting summary judgment because plaintiff failed to produce evidence showing deliberate indifference).

For the foregoing reasons, the Court grants the HIHS Defendants' Motion for Summary Judgment as to Plaintiff's § 1983 claims.

**E. Whether this Court Should Grant Defendant County of Hawaiʻi's MSJ as to Plaintiff's § 1983 Claims**

Plaintiff also alleges that the County of Hawaiʻi should be liable for any actions taken by HIHS, Whitaker, or Yamada that violated Plaintiff's constitutional rights.  SAC at 22-28.  The County argues that Plaintiff's claims against the County must fail because (1) they are "completely derivative of

-62-

his claims against HIHS, Whitaker, and Yamada" and (2) they are solely based on the fact that a contract exists between the County and HIHS.  HIHS Defs.' MSJ at 2 n.2, ECF No. 98.

First, the Court found in Section I.A. that Plaintiff did not meet his burden of showing a genuine issue of material fact as to whether the HIHS Defendants violated his constitutional rights.  See supra Section I.A. at 19-39.  Second, because HIHS is not liable under § 1983 under Monell, there is no basis for liability against the County of Hawai'i.  Third, even if HIHS was in fact liable, the mere existence of a contract between the County of Hawai'i and HIHS for animal control services does not give rise to liability on the part of the County.[33/]  See Monell, 436 U.S. at 692.  Plaintiff does not provide any evidence of a specific policy or custom of the County that would create § 1983 liability.  See supra 59-62 (analyzing requirements for Monell liability).

## II.  Whether this Court Should Grant Defendant Ostendorp's MSJ as to Plaintiff's § 1983 Claims

In Count III of the Second Amended Complaint, Plaintiff alleges that Defendant Ostendorp conspired with the HIHS Defendants to deprive him of his constitutional rights under the

---

[33/] The Court also notes that the contract between the County and HIHS cannot by itself impose liability because Hawai'i County Code § 4-9 states that HIHS or its employees are not viewed as agents or employees of the County.

Fourth, Fifth, and Fourteenth Amendments.[34/]  First, the Court
notes that Defendant Ostendorp cannot be held liable under § 1983
because, as Section I.A. demonstrates, Plaintiff did not meet his
burden of identifying a genuine issue of material fact as to
whether the HIHS Defendants violated his constitutional rights.
See supra Section I.A. at 19-39.

Second, Plaintiff cannot demonstrate that Defendant
Ostendorp acted under color of state law in order to impose
liability on Ostendorp for an alleged violation of his
constitutional rights.  The Ninth Circuit follows a two-part
approach to determine if the deprivation of a constitutional
right by private actors is fairly attributable to the state:  (1)
"the deprivation must be caused by the exercise of some right or
privilege created by the State or by a rule of conduct imposed by
the state or by a person for whom the State is responsible, and
(2) "the party charged with the deprivation must be a person who
may fairly be said to be a state actor." Florer v. Congregation
Pidyon Shevuyim, 639 F.3d 916, 922 (9th Cir. 2011) (quoting West
v. Atkins, 487 U.S. 42, 49 (1988).  The Supreme Court has stated
that "state action may be found . . . only if[] there is such a
close nexus between the State and the challenged action that

---

[34/] Plaintiff does not specifically mention Defendants Cox or
Dela Cruz in the § 1983 counts of his complaint.  See SAC Count
III - 42 U.S.C. § 1983.  The Court notes that the analysis in
Section III would also apply to Defendants Cox and Dela Cruz if
the § 1983 claims actually apply to these Defendants.

seemingly private behavior may be fairly treated as that of the State itself." Florer, 639 F.3d at 924 (quoting Brentwood Academy v. Tenn. Secondary School Athletic Ass'n, 531 U.S. 288, 295 (2001).

Regardless of whether Plaintiff satisfies the first part of the two-part approach, Plaintiff fails to raise a genuine issue of material fact regarding whether Defendant Ostendorp "may fairly be said to be a state actor." See Florer, 639 F.3d at 922.  The Court starts with the presumption that private actor conduct is not state action.  See Florer, 639 F.3d at 922. Plaintiff admits that Defendant Ostendorp was operating as a lawyer in private practice, and that such lawyers generally do not act under color of state law.  See Plntf.'s Opp. Memo to Ostendorp MSJ at 4, ECF No. 110.  However, Plaintiff attempts to establish that Ostendorp is a state actor by alleging that Ostendorp conspired with HIHS to deprive Plaintiff of the Dogs. See id at 5.

While a private actor like Defendant Ostendorp may be considered a state actor if he conspires with a state actor; Plaintiff must identify evidence that an "agreement" or "meeting of the minds" to violate constitutional rights occurred in order to impose state actor status on a private actor for § 1983 liability.  See United Steelworkers of America v. Phelps Dodge Corp., 865 F.2d 1539, 1540-41 (9th Cir. 1989).

-65-

Plaintiff has not done so here.  To support Plaintiff's claim of conspiracy, Plaintiff cites to (1) a letter from Ostendorp to Yamada dated October 7, 2009 and (2) a copy of an invoice statement from Ostendorp to Defendant Roberta Young dated October 19, 2009 ("Invoice Statement") reflecting that Defendant Ostendorp called the Humane Society and exchanged emails with agents of the Humane Society.  See Plntf.'s Opp. Memo to Ostendorp MSJ at 4, ECF No. 110.  However, neither the letter nor the content of the conversations between Ostendorp and HIHS establish a meeting of the minds to violate Plaintiff's constitutional rights.

Even if the Court assumes without deciding that Defendant Ostendorp knew that the Dogs were Plaintiff's and therefore violated Plaintiff's constitutional rights, this assertion cannot establish § 1983 liability because Ostendorp himself is not a state actor.  The actual state actors, the HIHS Defendants, did not have the requisite intention to violate Plaintiff's constitutional rights because (1) the Dogs apparently were not Plaintiff's property, and (2) as the Court discussed in Section I.A. herein, the HIHS Defendants did not have reason to know that the Surrender Form and the general POA were forged,

fraudulently obtained, or were otherwise invalid.[35/]  See *supra* at 27-29.

Under Plaintiff's version of the facts, the October 7 letter at best demonstrates that Ostendorp tried to deceive the HIHS Defendants into believing that the Dogs did not belong to Plaintiff[36/] - such deception is contrary to the idea that a meeting of the minds occurred.  See Annan-Yartey v. Honolulu Police Dep't., 475 F. Supp. 2d 1041, 1047 (D. Haw. 2007) (noting that, in cases where a defendant's false statements to police resulted in a plaintiff's arrest, the fact that the defendant's statements were false has no bearing on his status as a state actor).  Accordingly, the letter does not show that Ostendorp and the HIHS Defendants agreed to violate Plaintiff's constitutional rights because the Defendants did not have a meeting of the minds as to Plaintiff's alleged ownership of the Dogs.  Id.

The Invoice Statement and the content of the meetings mentioned therein also does not create a material issue of fact regarding the existence of "an agreement or 'meeting of the

---

[35/] Even if the Court assumes without deciding that Defendant Ostendorp committed fraud when he drafted the general POA and the Animal Surrender Form, this fact does not create a conspiracy with the state.  See Annan-Yartey v. Honolulu Police Dep't., 475 F. Supp. 2d 1041, 1047 (D. Haw. 2007).

[36/] The content of the letter states, inter alia, that Plaintiff "is not the owner of the dogs."  HIHS Defs.' MSJ Ex. C, ECF No. 98.

minds' to violate constitutional rights."[37/]   See United

Steelworkers of America v. Phelps Dodge Corp., 865 F.2d 1539,

1545-46 (9th Cir. 1989) (noting that evidence of cooperation with

law enforcement agencies does not prove a conspiracy).

While Yamada replied to Ostendorp that an animal

surrender form could be submitted; this statement does not

indicate that Yamada formed an agreement to violate Plaintiff's

constitutional rights.  Defs.' Supp. CSF Ex. 4 at 000016, ECF

Nos. 154 & 155.  Assuming *arguendo* that Yamada and Ostendorp

shared a common purpose of transferring ownership of the Dogs,

this common purpose in itself does not create a conspiracy under

§ 1983 - instead, the meeting of the minds must specifically

relate to the violation of constitutional rights.  Annan-Yartey,

475 F. Supp. 2d at 1046 (holding that no conspiracy existed even

though police arrested plaintiff based on private actor complaint

---

[37/] Plaintiff cannot rely on his conclusory allegations in
the Complaint or his pleadings to create a genuine issue of
material fact as to whether a conspiracy was formed between HIHS
and Defendant Ostendorp.  See Burns v. Cnty. of King, 883 F.2d
819, 821 (9th Cir. 1989) (holding that summary judgment was
appropriate when plaintiff only made conclusory allegations that
social worker conspired with prosecutor to deprive plaintiff of
civil rights), Simmons v. Sacramento Cnty. Superior Court, 318
F.3d 1156, 1161 (9th Cir. 2003) (holding that summary judgment
was appropriate when plaintiff only provided conclusory
allegations that private counsel conspired with state officers to
deprive plaintiff of due process), cf. Coverdell v. Dep't of
Social and Health Serv., 834 F.2d 758 (9th Cir. 1987) (affirming
district court's grant of summary judgment because plaintiff
failed to produce specific evidence of discriminatory animus for
§ 1985 claim).

because no meeting of the minds to violate plaintiff's constitutional rights occurred).

While Plaintiff argues in his brief that Yamada "assisted in orchestrating the fraudulent transfer"; Plaintiff identifies no evidence that Yamada actually had knowledge of the fraud.  See Annan-Yartey, 475 F. Supp. 2d at 1046 (holding that plaintiff failed to allege § 1983 conspiracy because, inter alia, there were no allegations that police officers knew that private actor lied about the TRO used to falsely arrest the plaintiff). Plaintiff's allegations and arguments do not qualify as evidence (see Coverdell, 834 F.2d at 762), and the uncontested evidence of the contents of Yamada's conversations with Ostendorp indicates that Yamada acted based upon the belief that Ostendorp and Roberta Young had authority to transfer the Dogs.

The Hawaiʻi AG Report reflects that Ostendorp approached Yamada, told her that he represented Plaintiff, told her that Plaintiff was under suicide watch at a hospital, and attempted to negotiate a deal to prevent Plaintiff from getting "into any more trouble since he was still on probation." Plntf.'s Supp. JCSF Ex. 4 at 000016, ECF Nos. 154 & 155. Ostendorp represented to Yamada that Roberta Young had the authority to transfer the Dogs to HIHS.  Id at 000016.  Yamada did take action to check these representations by telling Ostendorp that she would need to speak with the person who

actually had the general POA; on October 7, a woman purporting to be Roberta subsequently called Yamada to verify that she had a general POA and wanted to surrender the Dogs. Id. Additionally, Yamada requested that Ostendorp send her a copy of the general POA before HIHS would take action with respect to the Dogs. Plntf.'s Supp. JCSF Ex. 3, ECF No. 121.

Yamada's reliance on the general POA and Surrender Form subsequently submitted by Ostendorp demonstrates that she agreed to accept the surrender of the Dogs, but her reliance on the forms does not constitute evidence of an agreement to violate constitutional rights because the transfer was facially valid. Even assuming without finding that Ostendorp committed fraud as alleged by Plaintiff, the uncontroverted evidence demonstrates that Yamada and Ostendorp had two different mindsets as far as whether the transfer of the Dogs would violate Plaintiff's constitutional rights.

Plaintiff also argues that Ostendorp and Yamada had a "meeting of the minds" when they agreed not to tell Plaintiff about the surrender of the Dogs. Plntf.'s Supp. Opp. at 3. However, as articulated above, this "meeting of the minds" was not an agreement to violate constitutional rights because Yamada relied upon Plaintiff's purported agents' representations that Plaintiff no longer had ownership rights in the Dogs. Accordingly, Plaintiff fails to raise a genuine issue of material

fact regarding Ostendorp's state actor status and § 1983 liability.

## III. Whether this Court Should Exercise Supplemental Jurisdiction Over the Remaining Tort Law Claims

Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367.  When determining whether or not to remand the case to state court, this Court is required to balance the values of "economy, convenience, fairness, and comity."  See Acri v. Varian Associates, Inc., 114 F.3d at 1001.  However, the Supreme Court has stated that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  Carnegie-Mellon v. Cohill, 484 U.S. 343, 350 n.7 (1988).

The Supreme Court has noted that states have an interest in enforcing their laws.  See Carnegie-Mellon, 484 U.S. at 352.  In this case, the remaining claims for Defendants involve important matters of state tort law and attorney conduct.  See SAC at 27-35.  Additionally, the Court notes that all of the Defendants with federal claims asserted against them in this action requested the Court to decline to exercise supplemental

jurisdiction if the federal claims were dismissed.  See HIHS
Defs.' MSJ at 20 and Def. Ostendorp MSJ at 19.  Plaintiff
provides no compelling argument for this Court to retain
jurisdiction – Plaintiff merely asserts that this Court has
jurisdiction based on the federal claims.  Because the federal
claims in this case have been eliminated before trial, the
balance of factors tips in favor of dismissal. See Carnegie-
Mellon, 484 U.S. at 350.

     Accordingly, because the Court declines to exercise
supplemental jurisdiction, the Court declines to rule on (1) the
state law claims in Defendants County of Hawaiʻi, HIHS, Whitaker,
and Yamada's MSJ as to Plaintiff's SAC, (2) Defendant Roberta
Young's MSJ as to Plaintiff's SAC, (3) Defendants Ostendorp, Cox,
and Dela Cruz's state law claims in their MSJ as to Plaintiff's
SAC, and (4) Defendants Ostendorp, Cox, and Dela Cruz's MSJ as to
Roberta Young's Crossclaims.

## CONCLUSION

     For the foregoing reasons, the Court: (1) GRANTS
Defendants County of Hawaiʻi, Hawaiʻi Island Humane Society,
Donna Whitaker, and Starr Yamada's Motion for Summary Judgment as
to Plaintiff's SAC for Count I - 42 U.S.C. § 1983 (violations of
the Fourth, Fifth, and Fourteenth Amendments); Count II - 42
U.S.C. § 1983 (violations of the Fourth, Fifth, and Fourteenth

Amendments);[38/] Count IV - Violations of Equal Protection; and Count VI - Negligent Training and/or Supervision to the extent this claim relies upon federal constitutional law, (2) GRANTS Defendant Ostendorp's Motion for Summary Judgment as to Plaintiff's SAC for Count III - 42 U.S.C. § 1983, and (3) DECLINES to exercise supplemental jurisdiction as to the state law claims in Plaintiff's SAC, Defendant Michael Ostendorp's Crossclaim, Defendant Carroll Cox's Crossclaim, Defendant Darleen Dela Cruz's Crossclaim, Defendant Roberta Kawena Young's Crossclaim, and Defendants County of Hawaiʻi, Hawaii Island Humane Society, Donna Whitaker, and Starr Yamada's Crossclaim. Accordingly, the Court DECLINES to consider the state law claims in Defendants County of Hawaiʻi, Hawaii Island Humane Society, Whitaker, and Yamada's MSJ as to Plaintiff's SAC, Defendant Roberta Young's MSJ as to Plaintiff's SAC, Defendants Ostendorp, Cox, and Dela Cruz's MSJ as to Plaintiff's SAC, and Defendants Ostendorp, Cox, and Dela Cruz's MSJ as to Roberta Young's Crossclaims.[39/]

---

[38/] While Counts I and II both allege violations of constitutional rights based on the execution of the Search Warrant and seizure of the Dogs, Count II contains, inter alia, additional allegations regarding municipal liability.

[39/] The Court observes that, under 28 U.S.C. § 1367(d), the period of limitations for state claims based on this Court's supplemental jurisdiction "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."  Jinks v.
(continued...)

In view of the foregoing rulings, the Clerk of the Court is directed to (1) enter judgment in favor of Defendants County of Hawaiʻi, Hawaii Island Humane Society, Donna Whitaker, and Starr Yamada on Count I, Count II, Count IV, and Count VI (to the extent that claim relies upon federal constitutional law) of Plaintiff's Second Amended Complaint, (2) enter judgment in favor of Defendant Michael Ostendorp as to Count III of Plaintiff's Second Amended Complaint, and (3) close the case because the Court declines to exercise supplemental jurisdiction as to the state law claims in Plaintiff's Second Amended Complaint and Defendants' crossclaims.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, May 22, 2013.



_____
Alan C. Kay
Sr. United States District Judge

Young v. Cnty. of Haw. et al., Civ. No. 11-00580 ACK-RLP: ORDER (1) GRANTING IN PART AND DECLINING IN PART DEFENDANTS COUNTY OF HAWAIʻI, HAWAII ISLAND HUMANE SOCIETY S.P.C.A., DONNA WHITAKER, STARR K. YAMADA, AND MICHAEL OSTENDORP'S MOTIONS FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S SECOND AMENDED COMPLAINT (2) DECLINING DEFENDANTS ROBERTA KAWENA YOUNG, CARROLL COX, AND DARLEEN DELA CRUZ'S MOTIONS FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S SECOND AMENDED COMPLAINT, AND (3) DECLINING CROSSCLAIM DEFENDANTS MICHAEL OSTENDORP, CARROLL COX, AND DARLEEN DELA CRUZ'S MOTIONS FOR SUMMARY JUDGMENT AS TO ROBERTA KAWENA YOUNG'S CROSSCLAIM.

---

[39/] (...continued)
Richland County, S.C., 538 U.S. 456, 462-63 (2003).